Rita Sanders GEIER, et al., Plaintiffs,

United States of America, Raymond Richardson, Jr., et al., H. Coleman McGinnis, et al., Plaintiffs-Intervenors,

v.

Lamar ALEXANDER, et al., Defendants.

No. 5077.

United States District Court,
M.D. Tennessee,
Nashville Division.

Stipulation of Settlement
Aug. 31, 1984.

Decided Sept. 25, 1984.

Aleta Arthur, John L. Norris, Hollins, Wagster & Yarbrough, Nashville, Tenn., for plaintiff-intervenors (Class Representative of plaintiff class) H. Coleman McGinnis, John Arthur, Ethel Robertson, Harry Fuchs, Lyle McLevain, Darlene Marsh, Martin Deschenes, Delores Pierce and Millicent Yeargin.

Lewis Laska, J.D., Ph.D. Associate Professor, School of Business, Tennessee State University, Nashville, Tenn., for amicus curiae.

Michael J. Passino, George E. Barrett, Barrett & Ray, P.C., Nashville, Tenn., for plaintiffs.

Avon N. Williams, Jr., Richard H. Dinkins, Nashville, Tenn., Jack Greenberg, Joel Berger, Theodore M. Shaw, William Lann Lee, New York City, and Julius LeVonne Chambers, Charlotte, N.C., for Raymond Richardson, et al.

Julian W. Blackshear, Jr., Robert Smith, Petway &-Blackshear, Nashville, Tenn., for amicus curiae TSU Nat. Alumni Ass'n.

Michael Terry, Deputy Atty. Gen., Stephen Doughty, Richard L. Colbert, Asst. Attys. Gen., Nashville, Tenn., Beauchamp Brogan, University of Tennessee, Knoxville, Tenn., James W. Drinnon, Jr., Asst. General Counsel, University of Tennessee, Knoxville, Tenn., for defendants, including Brown, Nicks and Humphries.

Joe B. Brown, U.S. Atty., James C. Thomason, Asst. U.S. Atty., Nashville, Tenn., Nathaniel Douglas, Levern M. Younger, Gen. Litigation Section, Civil Rights Div., U.S. Dept of Justice, Washington, D.C., for plaintiff-intervenor U.S.A.

WISEMAN, Chief Judge.

## MEMORANDUM AND ORDER

Before the Court is the Stipulation of Settlement proposed in this case by the original plaintiffs, RITA SANDERS GEIER, et al., plaintiff intervenors, RAYMOND RICHARDSON, JR., et al., plaintiff intervenors, H. COLEMAN McGINNIS, et al., and defendants represented by the Attorney General of the State. The Attorney General has announced to the Court that he has obtained the concurrence in the proposed Stipulation of Settlement of the Governor, the Comptroller of the Treasury, the State Board of Regents, the University of Tennessee Board of Trust, and the Tennessee Higher Education Commission. The Settlement has been approved by counsel representing the NAACP Legal Defense Fund.

Absent from the proposed Settlement are the signatures of attorneys for the Civil Rights Division, United States Department of Justice. The Department filed objections to the Settlement. After oral argument on these objections heard August 13, 1984, the Court directed the parties to meet to consider the objections of the Department, and attempt to resolve these differences. On August 31, 1984, the Court was advised that agreement could not be reached with the Department, but all other parties submitted a slightly revised order bearing the signatures of all counsel except the United States Attorney General.

The Department submitted to the Court its proposed alternative to the order of the remaining parties. The Court has examined the proposed alternative very carefully and compared it to the proposed settlement of the other parties.

No party denies that greater progress can and must be made toward eliminating the dual system of higher education in Tennessee. The major difference between the Department of Justice's position and that of the remaining parties lies in whether numerical goals and objectives should be established, and in disagreement over some of the remedial methods chosen.

■ One of the remedial measures proposed is designed to increase the number of black professionals in Tennessee, and the number of blacks in the professional schools. For five years, beginning in 1985, 75 black sophomore students will be selected for a professional career track to include counseling, guidance and early admission if minimum admission standards are met.

The Justice Department objects to this program, insisting that it is beyond the remedial power of the Court. It argues that there must be a showing that the students selected for the program are victims of the racial discrimination challenged in this case. It would expand the holding of the Memphis *Firefighters* case to school desegregation cases and require "victim specificity." *See Firefighters Local Union No. 1784 v. Stotts,* —— U.S. ——, —— and n. 9, 104 S.Ct. 2576, 2587 and n. 9, 81 L.Ed.2d 483 (1984). *See also University of California Regents v. Bakke,* 438 U.S. 265, 307–09, 98 S.Ct. 2733, 2757, 57 L.Ed.2d 750 (1978).

This Court is conscious of its role in the governmental scheme. Neither in this case, nor in any other, does this Court intend to invade the legislative prerogative nor engage in social engineering. The proposed measures do neither. They are part of a comprehensive remedial plan addressing a recognized but perverse problem. While this Court is not convinced that "victim specificity" is the standard applicable in cases involving public education, it concludes that, even if applicable, the standard is not as narrowly circumscribed in the context of public education as compared to its application in employment cases under Title VII. Public education represents a basic foundation of our society. Accordingly, the Court must consider a much broader range of factors in evaluating the (1) presence and effect of racial discrimination in a state's university system and (2) the appropriate methods by which to eradicate its influence. Further, the standard of victim specificity is not as exacting when considering the effects of past and present racial discrimination as it impacts on persons attending or who will attend public colleges and universities as compared to the employees at a particular work location. This Court need not trace a precise nexus between a specific black child and particular acts of racial discrimination to conclude that the individual has suffered the effects of racial discrimination. Rather, it is sufficient for this Court to base its remedial order on a finding that members

of the defined group have suffered the effects of specific acts of discrimination. *Bakke,* 438 U.S. at 307–08, 98 S.Ct. at 2757; *United Jewish Organizations v. Carey,* 430 U.S. 144, 167–68, 97 S.Ct. 996, 1010–11, 51 L.Ed.2d 229 (1977).

This Court rejects the position of the Justice Department that an evidentiary record must be compiled to prove that the black youth of Tennessee are victims of discrimination and that remedial programs will benefit them specifically and exclusively. As Justice Burger noted in *Milliken v. Bradley,* 433 U.S. 267, 287, 97 S.Ct. 2749, 2760, 53 L.Ed.2d 745 (1977) (Milliken II), a court may consider both educational and cultural forces present in society in reaching the conclusion that a certain group of children have been isolated from society and subjected to disparate and discriminatory treatment. In dealing with the broad and paramount issue of public education, this Court takes judicial notice of the long history of social, economic and political oppression of blacks in Tennessee—a history marked by years of slavery followed by years of Jim-Crow laws. It is the past and present state of Tennessee's universities that the Court identifies as the specific instance of racial discrimination; its effects are pervasive throughout the black community, affecting practically all black men, women, and children in the state.

A classification that aids persons identified as members of a victim group is permissible provided there has been some judicial, administrative or legislative finding of constitutional or statutory violations. *Bakke* 438 U.S. at 307, 98 S.Ct. at 2757. At an earlier stage of this case, Judge Gray found an unconstitutional *de jure* segregation in Tennessee higher education. *Sanders v. Ellington,* 288 F.Supp. 937, 942 (M.D.Tenn.1968). This proposed decree not only recognizes the existence of residual effects, it recognizes that previous remedial measures have not succeeded in removing such effects. Such a finding creates a compelling interest in vindicating the legal rights of the victims, even if it requires the

extension of certain preferences formulated to aid the individuals overcome the effects of the past unlawful acts. *Id.* This Court is empowered, if not compelled, to implement a remedy formulated to reverse the effects of such treatment. *Geier v. University of Tennessee,* 597 F.2d 1056, 1065 (6th Cir.1979). This Court is convinced that its order today is tailored to redress the nature and extent of violations against specific victims of racial discrimination. *Hills v. Gautreaux,* 425 U.S. 284, 293–94, 96 S.Ct. 1538, 1544, 47 L.Ed.2d 792 (1976); *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971); *Louisiana v. United States,* 380 U.S. 145, 156, 85 S.Ct. 817, 823, 13 L.Ed.2d 709 (1965).

The decree further sets out a five-year interim objective of at least 50 percent white faculty and administration at TSU, and a 1993 objective of 50 percent white full-time undergraduates. The Department objects to both of these as being unconstitutional "quotas."

The heart of the problem is traditionally black TSU. This has been recognized by this Court in previous decrees. *See Sanders v. Ellington,* 288 F.Supp. 937, 943 (M.D.Tenn.1968); *Geier v. Dunn,* 337 F.Supp. 573, 580, 581 (M.D.Tenn.1972); *Geier v. Blanton,* 427 F.Supp. 644, 661 (M.D.Tenn.1977). To paraphrase the Supreme Court in the landmark language of *Swann v. Charlotte-Mecklenburg,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), it is still possible to identify TSU as a black school by reference to its student body, the racial composition of its teachers and staff, the quality of its school buildings and equipment, and the schedules of its athletic teams. Where such is the case "a prima facie case of violation of substantive constitutional rights under the Equal Protection Clause is shown." *Swann,* 402 U.S. at 18, 91 S.Ct. at 1277.

In 1972, this Court observed:

the phenomenon of a black Tennessee State, so long as it exists, negates both the contention that defendants have dismantled the dual system of public higher education in Tennessee, as ordered by this court, and the contention that they are, in any realistic sense, on their way to doing so.

*Geier v. Dunn,* 337 F.Supp. 573, 576 (1972).

In this case, the Court has employed various methods to bring about a unitary system of public higher education. Finding that these methods had been ineffective, particularly as they related to TSU, the Court ordered merger of TSU with University of Tennessee Nashville [UTN] in 1977. *Geier v. Blanton,* 427 F.Supp. 644 (M.D. Tenn.1977).

Since the merger, resegregation has taken place at TSU, and inadequate progress has been made at the remaining colleges and universities. The deterioration at TSU has been particularly disheartening.

The downhill course in student body desegregation is best illustrated by reference to the 1983 Progress Report, Table II. Black first-time freshmen as a percent of total first-time enrollment freshmen from 1979, immediately after the merger, through 1983 was:

    1979—69.7 percent
    1980—85.6 percent
    1981—92.9 percent
    1982—92.5 percent
    1983—90.2 percent

Prior to merger, blacks made up 58 percent of administrators at UTN and TSU (numbers combined). That percentage is now 72.6 percent black. Of the 16 vice-presidents, deans, and president at the merged TSU, only three are white. There are 195 black faculty members at TSU and only 44 at all other State Board of Regents [SBR] institutions combined.

It is obvious the phenomenon of a black TSU still exists, and, just as it did in 1972 in Judge Gray's words, it still negates the contention that the dual system has been dismantled.

The plaintiff intervenors alleged that the TSU President and administration had consciously sought to bring about the resegregation and maintain the black identity of

TSU. They further alleged that the defendants had participated in the effort. A trial of these issues was averted by the proposed settlement decree. Some of the statements attributed to President Humphries would lend credence to the charge. The defendants had control of hiring practices, and their tacit compliance in the scheme may be inferred from the statistical evidence. No doubt the settlement of the case has averted the throwing of stones at a variety of glasshouses. This is to be commended and approved, if possible, despite the objections of the Justice Department.

This Court does not live in a vacuum. During the pendency of this matter there has been a march of TSU students on the courthouse, public statements by student leaders, and letters to the editor by faculty members, all urging and insisting upon the retention of TSU's black identification. Regrettably, this Court has not observed any public statements by community leaders pointing out the paradoxical inconsistency of this position.

The goal of this society, at least since 1954, has been the elimination of state imposed racial segregation. We have been striving for the day when, as Rev. King described it so eloquently, people would be recognized for the content of their character rather than the color of their skin. We must move toward the day when schools are not recognized as "black schools" or "white schools" but when the State of Tennessee operates, and the taxpayers of Tennessee fund, just "schools"—and hopefully, those the best we are able to provide.

A desegregation remedial plan is to be judged by its effectiveness. *Swann, supra,* 401 U.S. at 25, 91 S.Ct. at 1280. This Court has retained jurisdiction to effectuate the decree and to modify the remedies if found to be inefficacious. The parties in this case, through long and serious negotiations, have come up with a series of proposed additional requirements that should have a salutary effect. The numerical objectives for faculty and student body racial mix are clearly defined to be objectives and

*not* quotas. There is nothing in the decree which limits either race participation. Guideposts and goals are valuable when progress is to be measured. The establishment of a goal or objective encourages effort toward an end. Whether or not the goal is reached or exceeded will only be one of many indicia of the good faith efforts of all the parties to achieve a unitary system, if that issue is ever again in question.

The ultimate goal is *not* any ideal ratio or mix of black and white students or faculty. The goal is a system of higher education in Tennessee tax-supported colleges and universities in which race is irrelevant, in which equal protection and equal application of the laws is a reality. On the road to achieving this state of color-blindness, there must be color-consciousness to overcome the residual effects of past color-based discrimination. The proposed settlement decree is not illegal, and it offers promise of more effective remedies in attacking a seemingly Gordian problem. Counsel and the parties are to be commended for their understanding and generosity toward each other, for their optimism in believing that Tennessee can and should move ahead in this most vital area of service to all of its citizens. This Court applauds the noble motives of all counsel in this case, including the attorneys for the Department of Justice. Sincere and strenuous efforts were made by all counsel to agree on the best courses of action, in common recognition of problems. The fact that final and complete agreement was not reached does not demean the effort nor the actors.

The Court will sign the proposed STIPULATION OF SETTLEMENT submitted by all parties except the Department of Justice.

### STIPULATION OF SETTLEMENT

Plaintiffs RITA SANDERS GEIER, et al., and Plaintiffs-Intervenors RAYMOND RICHARDSON, JR., et al., and Plaintiff-Intervenors H. COLEMAN MCGINNIS, et al., having sought further injunctive relief to effectuate statewide desegregation of all

Tennessee institutions of public higher education, and having conducted extensive negotiations with all parties to this lawsuit in an effort to bring about a just resolution of the issues, without further litigation, that will achieve a unitary [1], desegregated system of public higher education in the State of Tennessee,

IT IS HEREBY STIPULATED by and between the undersigned, and subject to this Court's approval, as follows:

## I. INTRODUCTION

A. The primary purpose of this Stipulation of Settlement is the elimination of Tennessee's dual system of higher education. This purpose includes the maximization of educational opportunities for black citizens of the State of Tennessee and the improvement of educational opportunities for black citizens of the State of Tennessee. The parties agree that statewide access to public higher education in the State of Tennessee by black students and the degree of black presence in faculty and administrative positions statewide will not be decreased as a result of the implementation of the provisions of this Stipulation. It is the intention of the parties that the dismantling of the dual system shall be accomplished in such a way as to increase access for black students and increase the presence of black faculty and administrators statewide and at the historically white institutions.

B. Defendants commit to continue efforts to achieve their current desegregation objectives and to revision of those objectives as necessary after the pertinent studies referenced herein are completed. It is the intention of defendants through implementation of this plan to achieve desegregation of all institutions of higher education in the state.

C. Each defendant agrees to include a proposed budget for their part of any plan or program developed hereunder and to request adequate funding for each plan or program at their respective stages of the

normal budgetary process and the Governor will make every effort within the budgetary process to secure adequate funding from the General Assembly. Prior to finalization of this stipulation of settlement, and no later than October 1, 1984, defendants University of Tennessee (UT) and the State Board of Regents (SBR) shall submit to all parties an estimated total amount necessary to implement the plans and programs to be developed hereunder.

D. Defendants agree to begin collecting selected data in accordance with the reporting forms of the Office of Civil Rights (OCR) of the United States Department of Education, but will continue to monitor progress by means of established reporting methods in order to preserve historical comparisons. The data to be utilized will be selected by mutual agreement of all parties prior to finalization of this Stipulation of Settlement, and no later than October 1, 1984.

E. The Desegregation Monitoring Committee will establish a procedure for monitoring and reporting progress to the Court on the desegregation of all institutions. The Committee will identify problem areas and make recommendations to the defendants concerning research and actions that should be undertaken and new programs that should be developed to address problem areas.

F. Progress toward desegregation at Tennessee State University (TSU) shall be placed under the Desegregation Monitoring Committee and shall be monitored in the same manner as is progress in desegregation at the other institutions.

G. Each Monitoring Committee report shall include a description of specific steps taken to implement each provision in this settlement agreement. In areas where sufficient progress has not been made, the Desegregation Monitoring Committee shall include in the monitoring committee report further steps to be taken by the boards to assure progress in this area.

---

1. It is the purpose of this order to achieve a unitary desegregated system and not to achieve a merger of the existing systems of higher education in Tennessee.

H. Each Desegregation Monitoring Committee report shall include a listing of each presidential/chancellor, vice presidential/vice chancellor and dean position filled during the reporting period at each university, with the number and race of applicants for each position and the race of the person selected.

I. All plans to be developed pursuant to this Stipulation of Settlement shall run for a period of five years and shall contain benchmark objectives to be achieved by the end of each year.

## II. STUDENT DESEGREGATION

A. Interim objectives and methodologies for setting long range objectives shall insure the achievement of non-racially identifiable institutions of higher education in Tennessee.

B. Defendants agree that as soon as necessary data are available, and no later than one (1) year from the date of this Stipulation of Settlement, a study will be conducted to ascertain whether there is a statewide disparity in college-going rates among black and white high school graduates in Tennessee, and long-range and interim desegregation objectives will be modified if necessary in an effort to eliminate any statewide disparity. Said study shall be completed no more than 180 days from the date the necessary data are available.

C. Defendants will conduct a study within 180 days to ascertain whether there is a statewide disparity by race in the ratio of graduates of public institutions in Tennessee who enter graduate or professional programs in public institutions in Tennessee, and long-range and interim desegregation objectives will be modified if necessary in an effort to eliminate any statewide disparity.

D. SBR shall immediately establish a 1993 interim objective for Tennessee State University (TSU) of 50% white undergraduate full-time equivalent enrollment. The parties agree that the ultimate long range objectives for the racial composition of the students at TSU will be set on the same basis as the objectives are set at all other institutions in the State.

E. SBR commits to retain such admission policies at its 2-year institutions for the foreseeable future and for at least five years as will insure educational access to any high school graduate.

F. Defendants will provide within 90 days a statewide survey of admissions and retention requirements for 4-year public institutions. If either governing board should take any steps in the next five years to increase admissions and/or retention requirements and to establish minimum requirements statewide, the Board will:

1. Conduct a desegregation impact analysis prior to the implementation of the new requirements, to ascertain whether these new requirements will have an adverse impact on black students;

2. Authorize institutions to enroll a percentage of new entering classes under alternative admissions standards, said percentage to be determined periodically by the appropriate governing board and to be consistent with the objectives of this Stipulation of Settlement. The rate of alternative admissions at TSU shall in no event be increased beyond the rate for the 1984–85 academic year;

3. Provide for the phasing in of these new requirements;

4. Provide developmental education programs consistent with any master plan as provided in T.C.A. § 49–7–202(c)(1) as approved by the governing board(s) available to students throughout the state to promote retention of those students entering under alternative admissions standards. The funding and standards for these programs will be developed as needed, in accordance with the implementation of parts 1 through 3 of this paragraph II (F); and

5. Each institution, through its respective governing board, will advise the Desegregation Monitoring Committee of the expected impact of in-

creased admission and/or retention standards and will report on its desegregation objectives in light of the new standards, and also will report on alternative means of achieving its desegregation objectives.

6. SBR agrees that the admission standards at TSU will be raised over a period of 5 years. The admission standards shall include a minimum GPA and minimum ACT neither of which shall be lower than those established for MTSU. TSU minimum GPA shall increase to no less than a 2.25 over the next five years.

G. The defendants shall conduct a study within 120 days to determine the feasibility of a plan whereby other-race[2] students shall be accorded tuition discounts, loans, scholarships and/or other incentives for purposes of desegregation. These incentives will also be studied for the purpose of encouraging the retention of other-race students. The plan shall be implemented by the fall semester of 1985 if and to the extent feasible.

H. Within 180 days defendants will identify graduate programs where blacks are underrepresented; defendants will develop a scholarship program for Tennessee residents to achieve graduate desegregation objectives and defendants will request adequate funding for this program pursuant to paragraph I(C) hereinabove; and universities will submit projections for increasing the number of blacks appointed as teaching and research assistants.

I. No public institution of higher education in Tennessee shall actively engage in racial discrimination or practices which discourage enrollment or involvement of other-race persons.

J. UT and SBR shall conduct a study of each of their respective institutions to determine whether any public institution of higher education in Tennessee projects an image as being racially identifiable. UT and SBR each shall appoint members of a bi-racial committee to conduct this study. Each committee shall consult with a broad spectrum of residents in the service area, as well as the faculty, students and administration of each institution and shall report its findings and recommendations to the appropriate governing board within 120 days. SBR and UT Boards shall implement changes necessary to create in each institution the image of an institution that serves the citizens of Tennessee on a non-racial basis.

K. Defendants will review various postsecondary developmental education programs and develop within one year a plan designed to address the retention, performance and progression of students at all public institutions.

L. SBR and UT will within 180 days review their financial aid programs to identify any inequities in the awarding of public or private financial aid and, if inequities are identified, implement appropriate measures to eliminate such disparities. The award of merit scholarships shall be reviewed to determine if they are made on any basis other than merit.

M. SBR and UT will monitor, develop and/or coordinate a statewide other-race recruiting program, utilizing bi-racial recruiting teams, for the institutions within the respective systems. This program shall be fully operational within 180 days from the date of this Stipulation of Settlement, and shall contain the following elements:

1. Each predominantly white institution shall utilize a black and each predominantly black institution shall utilize a white for recruiting other-race students. By fall semester, 1985, 50% as an objective of the recruiters used by TSU shall be white.

2. To assist the institutions in identifying prospective other-race students, defendants shall obtain from the Educational Testing Service and the

---

**2.** "Other-race or minority students" and "other-race or minority faculty" refer to white persons with respect to predominantly black institutions and black persons with respect to predominantly white institutions.

American College Testing Program, and provide to each institution each fall, a list of all Tennessee students (by race) still enrolled in high school who took the SAT or ACT and agreed to have their names released.

3. Each institution shall send recruitment literature to each high school in its service area and encourage the high school to disseminate the same to all students, with particular emphasis given to reaching other-race students.

4. Defendants shall develop and provide to the predominantly white institutions which have graduate and professional programs a list of all black students expected to graduate during that school year from public and private undergraduate institutions in Tennessee, and who agree to have their names and their educational records released. The list shall provide the following information: name of each student, the student's major field, grade point average, and other relevant information. Each predominantly white institution shall actively seek applications from qualified students whose names appear on the list.

5. Defendants shall obtain and provide to all predominantly white institutions a list of all black students enrolled in Tennessee institutions of public higher education who take the Graduate Record Examination (GRE) and who agree to have their names released. Each predominantly white institution shall solicit applications from among all qualified students whose names appear on the list.

6. Tennessee's state-supported law schools shall obtain through the SBR and UT Governing Boards a list of black students enrolled in Tennessee's public and private four-year institutions who have taken the Law School Admission Test (LSAT) and agree to have their names released. A comparable list of black students who have taken the Medical College Admission Test (MCAT) and the Dental Admission Test (DAT) shall be supplied to Tennessee's state-supported medical and dental schools. The professional schools shall actively seek applications from among qualified black students who take the above-named examinations and whose names appear on the appropriate list.

N. Defendants will coordinate the development of a cooperative program to increase the number of black students who enroll in and graduate from professional programs. Every spring beginning in 1985 and for five years, 75 black sophomore students who are Tennessee residents enrolled in Tennessee public institutions will be selected by committees representing the faculties of all state-supported professional schools and all other public universities in the state for pre-enrollment in the state's schools of law, veterinary medicine, dentistry, pharmacy and medicine. There shall be representation by black faculty members on these committees, to the extent available. The professional schools will counsel these students, assist in planning their pre-professional curricula, provide summer programs at the end of their junior and senior years and agree to their admission as first year professional students if they successfully complete their undergraduate work and meet minimum admissions standards. Defendants will consult with other states that have developed similar programs [*e.g.*, Kentucky] and complete development of the program described in this paragraph II, (N), including a proposed budget and projected source of funds, within 180 days.

III. EMPLOYMENT

A. Defendants will review various approaches, including effective programs in other states, to increase the number of qualified black applicants for employment in public institutions of higher education in Tennessee. Defendants will implement the program(s) determined to be feasible and effective to increase the number of quali-

fied black applicants. Defendants will actively recruit in the relevant labor market to increase the black presence, especially in disciplines where blacks are underrepresented, at the predominantly white institutions.

B. Within 180 days, SBR and UT shall develop a plan, including financial and other incentives, to attract white faculty and administrators to TSU and black faculty and administrators to predominantly white institutions. The plan shall be widely publicized at all institutions. The plan shall address credit for prior service and other benefits of any person eligible for participation in the plan, including transferring faculty members to the extent allowed by law.

C. Defendants will within 120 days identify disciplines where blacks are underrepresented and where the national availability pool is small, and request adequate funding through the budgetary process pursuant to ¶ I (C) above to develop a "grow-your-own program," utilizing the public and private universities in Tennessee, to increase the pool of qualified black candidates for employment as faculty and administrators in the public universities.

D. SBR and UT will within 120 days request adequate funding through the budgetary process pursuant to ¶ I (C) above to institute a staff development program, to enable black staff members to obtain advanced degrees and become eligible for positions of higher salary and higher rank within all institutions of higher education in the State of Tennessee.

E. Defendants will develop a plan for a Black Faculty Development Program, including a proposed budget therefor, within 120 days. The program will be designed to increase the number of black faculty with doctoral degrees at all public institutions of higher education.

F. SBR shall immediately establish as a five year interim objective for the desegregation of TSU's faculty and administration

at least 50% white faculty and at least 50% white upper level administrators (president, vice-presidents, deans, department chairs). All other institutions shall increase their efforts to attract and employ other-race faculty and administrators and accomplish their objectives for other-race employment by utilizing the provisions herein. After a period of five years, the defendants shall assess progress made under this plan and set further interim and/or long-range objectives for each institution as may be required to achieve a non-racially identifiable system of higher education.

G. Progress in affirmative action will be a factor in the review of department heads, deans and vice presidents/vice chancellors by institutional presidents and chancellors and in the review of presidents and chancellors by the chief executive officer of each system.

H. The SBR and UT must approve or disapprove, prior to any offer being extended, the recommended choice of the administration at each of its universities for the positions of vice president/vice chancellor, dean and department chair, beginning immediately upon execution of this agreement. This review will take into account the following factors:

1. The credentials and qualifications of the applicant.
2. Affirmative action [3] responsibilities of the institution in the system of the Board, and the degree of achievement of institutional desegregation objectives.
3. The degree of commitment to affirmative action on the part of the applicant.

IV. HIGHER EDUCATION IN MIDDLE TENNESSEE

A. SBR and the Tennessee Higher Education Commission (THEC) agree to develop within 180 days a comprehensive plan for the enhancement of Tennessee State

3. "Affirmative action" refers to efforts to increase employment of black staff and faculty or enrollment of black students at historically white institutions and enrollment of white students and employment of white staff and faculty at historically black institutions.

University (TSU), with the unique specialized regional and statewide missions, and to implement TSU's mission as the regional urban university for Middle Tennessee. Sufficient funding through the normal budgetary process will be projected in order to achieve success of the provisions of the plan.

B. To the extent that the increase in admission standards at TSU is expected to increase the quality of the student body but have an adverse budgetary impact as a consequence of total enrollment decline, THEC will follow its existing policy of negotiating a wider enrollment range for TSU so as to minimize this budgetary impact.

C. Within 120 days SBR will complete a physical facilities study for TSU that will include: a) a report of a comparative study between TSU and selected regional, predominantly white institutions throughout the State which are comparable, to identify deficiencies in TSU's physical plant and total campus environment; b) an assessment of the cost of bringing all TSU facilities up to standards for safety, health, environmental protection, and access to the handicapped; c) recommendations for changes or alterations necessary to support TSU's new mission.

Within 60 days of completion of the study, SBR will complete a plan to implement necessary renovations, modifications, and new construction at TSU in accordance with the study, such implementation to be completed within five years.

D. SBR will include in the TSU physical facilities plan the total cost of implementation and the proposed source of funds (state appropriations, bond issues, federal sources, etc.). SBR commits to assuring facilities at TSU that are comparable to those at comparable predominantly white institutions and adequate for TSU's enhanced mission.

E. SBR will within 120 days convene presidents and senior academic officers at Austin Peay State University, Middle Tennessee State University and TSU to a) discuss whether program duplication, especially at the post-baccalaureate levels, is a barrier to the implementation of the state's commitment to enhance TSU and b) develop a plan for the realignment of certain specified programs in order to support TSU's enhanced mission. *E.g.*, post-baccalaureate programs in education will be reviewed and, if necessary, realigned to create a master's degree in urban education at TSU.

F. During the next five years, the SBR will accord TSU first priority for all new graduate program proposals in the Middle Tennessee region. No doctoral programs will be proposed or approved for Middle Tennessee State University or Austin Peay State University during the five-year period. In addition, there will be no net increase of new master's level degree programs at either Middle Tennessee State University or Austin Peay State University during the five-year period.

G. SBR will develop at TSU within 120 days, with appropriate services of experts, needed and effective new programs to be offered at TSU. These proposed programs will be submitted to THEC for review and THEC approval will be obtained prior to implementation of the programs. In exercising its responsibilities of review and approval, the THEC will give special consideration to programs consistent with the aims of this plan.

H. SBR will within 180 days develop at TSU an Institute of Government, funded through the normal budgetary process, offering a degree program and courses for credit in public administration to train qualified administrators as needed for senior and middle level positions in state, county and local government and to conduct research. SBR will provide consultants to TSU to assist in the development of this new program and to recommend how TSU's current program in public administration could be strengthened and the kinds of new programs that should be offered.

I. SBR will request adequate funding pursuant to Paragraph I (C) hereinabove to match any existing or future scholarship programs designed to increase white stu-

dent enrollment at TSU with an identical scholarship program designed to increase black enrollment at Middle Tennessee State University.

J. The Board of Regents shall formulate a plan for the implementation of an educational "consortium" between MTSU and TSU which will require the institutions to establish a common university calendar, publish and disseminate a joint listing of all courses offered at each institution and design registration procedures whereby students at one institution may attend classes at the other for up to 30 hours of credit.

K. The SBR shall within 180 days initiate a study of all facets of administrative functions at all campuses of TSU. Faculty and students from both campuses of the institution will actively participate in this study. Specific recommendations for personnel and other changes necessary to improve the administrative function of all campuses of the university shall be made and implemented by the SBR.

V. Copies of all plans and proposals required to be formulated pursuant to this stipulation shall be submitted to counsel for all parties prior to implementation. Copies of all budget requests for plans or proposals developed pursuant to this Stipulation of Settlement shall be submitted to counsel for all parties to the lawsuit by the THEC upon receipt from UT and SBR.

VI. Each institution in the SBR and UT system shall annually make a substantial number of recruiting visits to other-race high schools.

VII. The governing boards or the institutions under their jurisdiction will conduct a desegregation impact analysis prior to implementing any proposals for the creation of new institutions or initiating changes in the mission of existing institutions. Defendants commit to implementing no such changes which would be inconsistent with provisions of this Stipulation of Settlement or which would adversely affect desegregation of higher education in Tennessee.

VIII. Defendants agree that no institution will be identified as a one-race institution or a predominantly one-race institution in any official university publication or in any public statement made in an official capacity by any administrator of that institution. Each institution mission statement shall refer to its mission as an institution committed to education of a non-racially identifiable student body.

IX. This Stipulation of Settlement shall not prevent any plaintiff or plaintiffs-intervenors from seeking further relief if funding requested through the normal budgetary process is not provided by the legislature to implement its provisions or is otherwise not provided.

X. If plaintiffs or any of the plaintiffs-intervenors to this lawsuit believe that any defendant or any agent or employee of a defendant is not acting in good faith to implement the provisions of this Stipulation of Settlement, their counsel shall initially bring the matter to the attention of defendants' counsel in writing, with service upon counsel for all other parties, identifying the specific act or acts alleged to be inconsistent with the objectives of this Stipulation of Settlement. The parties will make every effort to resolve such disputes informally without bringing the matter before the Court. However, if efforts at informal resolution of disputes are unsuccessful, any of the plaintiffs or plaintiffs-intervenors to this lawsuit may file a motion with the Court for further injunctive relief to enforce compliance with this Stipulation of Settlement.

Upon the filing of a motion by any party the Court shall hear arguments from counsel for all parties. The Court shall set the motion(s) for hearing within 60 days.

XI. The objectives provided for in this Decree are not to be construed as quotas.

XII. Defendants do not admit that failure to achieve any objective in itself constitutes noncompliance with this Decree.

XIII. Defendants by agreeing to this Stipulation do not admit that they are presently in violation of any constitutional or statutory provision.