RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0329P (6th Cir.)
File Name: 04a0329p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

RONALD C. LEADBETTER,
 *Plaintiff-Appellant,*

 *v.*

No. 02-6360

J. WADE GILLEY,
 *Defendant-Appellee.*

---

Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.
No. 00-00661—Thomas W. Phillips, District Judge.

Argued: March 10, 2004

Decided and Filed: September 29, 2004

Before: MARTIN and CLAY, Circuit Judges; MILLS,
District Judge.[*]

---

## COUNSEL

**ARGUED:** David R. Duggan, GARNER & DUGGAN,
Maryville, Tennessee, for Appellant. Edward G. Phillips,

---

[*] The Honorable Richard Mills, United States District Judge for the
Central District of Illinois, sitting by designation.

KRAMER, RAYSON, LEAKE, RODGERS & MORGAN,
LLP, Knoxville, Tennessee, for Appellee. **ON BRIEF:**
David R. Duggan, GARNER & DUGGAN, Maryville,
Tennessee, for Appellant. Edward G. Phillips, Penny A.
Arning, KRAMER, RAYSON, LEAKE, RODGERS &
MORGAN, LLP, Knoxville, Tennessee, for Appellee.

---

## OPINION

---

RICHARD MILLS, District Judge. The district court
awarded summary judgment against Ronald C. Leadbetter on
his employment discrimination claims.

He appeals.

We AFFIRM.

### I. FACTUAL AND PROCEDURAL BACKGROUND

In early September 1999, University of Tennessee (the
"University") General Counsel Beauchamp Brogan
announced his retirement effective December 31, 1999. The
University's then-president, J. Wade Gilley, proceeded to fill
the job opening. Prior to any advertisement of or search for
a replacement, Gilley asked Brogan whether he could directly
promote Deputy General Counsel Catherine Mizell to the
position. After Gilley received legal advice to the contrary,
he initiated a job search for the position.

Gilley authorized a formal search for general counsel
candidates. At Gilley's direction, Brogan prepared a formal
announcement for the position of Vice President, General
Counsel, and Secretary. The announcement stated that:

The successful [General Counsel] candidate must have
the following minimum qualifications: (1) J.D. or L.L.B.
from an accredited law school; (2) admission to, or

immediate eligibility for, the Tennessee State Bar; (3) a minimum of fifteen years of legal practice experience, at least ten of which must have been as full-time, in-house counsel for a multi-campus, public institution of higher education; (4) experience in transactional matters and civil litigation; (5) strong analytical skills and (6) understanding of and commitment to affirmative action and to achieving the University's affirmative action objectives.

The search was conducted exclusively by University Trustee Roger Dickson. Dickson forwarded the names of candidates he believed to be most qualified for the position. One of the candidates on Dickson's list was associate general counsel Ronald Leadbetter. Other than the fact that Leadbetter was an associate with the general counsel's office who oversaw some litigation at the University of Tennessee's Memphis campus, there is little information in the parties' briefs concerning Leadbetter's credentials.

Deputy General Counsel Mizell was another candidate whose name appeared on Dickson's list. Mizell had been promoted over Leadbetter six years prior to Brogan's retirement. She was a former editor-in-chief of the University of Tennessee Law Review and she met all of the job requirements for General Counsel. In her fifteen years at the University, she managed the General Counsel's staff and budget, reviewed other attorneys' work, and handled the University's most complex legal issues—including a $225 million transfer of the University's hospital to a not-for-profit organization. Additionally, Mizell was recommended by General Counsel Brogan, former President Joseph E. Johnson, and the three highest-ranking administrators at the University. Brogan did not recommend Leadbetter for the general counsel position because Brogan felt that Leadbetter lacked the necessary academic background, management skills, and analytical tools.

Gilley interviewed Mizell and Leadbetter for the position of Vice President and General Counsel. Gilley interviewed Mizell twice and Leadbetter once. According to Leadbetter, it was clear to him from the outset of the 15-minute interview that Gilley was not interested in his qualifications for the position since the interview involved little more than "chit-chat" unrelated to Leadbetter's credentials.

On December 14, 1999, Gilley met with Leadbetter. Gilley stated that he had spoken to the administrative staff and the staff had advised him that either Leadbetter or Mizell could do the job. Nevertheless, Gilley told Leadbetter that he decided to recommend Mizell to the Board of Trustees. On December 20, 1999, the Board of Trustees' Executive Committee unanimously elected her Vice President, General Counsel, and Secretary.

Following his decision to hire Mizell, Gilley attempted to address budgetary woes by streamlining and restructuring of the University's administration. One of the new job titles created via the restructuring was Equity and Diversity Administrator. The job paid $35,000 less than Leadbetter was earning as Associate General Counsel.

Gilley believed that experience in race relations and a commitment to diversity and civil rights were important qualities for the Equity and Diversity Administrator position. Theotis Robinson, an administrative aide in the University's Governmental Relations Office, had those qualities. Although Robinson did not have a bachelor's degree, he was a member of the Knoxville City Council, served as the University's liaison to the Legislative Black Caucus in Nashville, acted as an informal government liaison to the City of Knoxville and Knox County governments, co-chaired an organization of African-American and Caucasian community leaders, and advised the University on issues important to state and local African-American political leaders.

Gilley needed an Equity and Diversity Administrator who could advise him directly on relations with African-American students, faculty, administrators, and local leaders. In Gilley's estimation, Robinson was the best candidate for the position. Thus, Gilley assigned Robinson the job. Leadbetter claimed he was unaware that Gilley had appointed Robinson to the position of Equity and Diversity Administrator until after the appointment was announced. While he learned that Robinson would be promoted to the staff vice president level before the promotion was finalized, Leadbetter did not apply for the position—one that paid $11,400 less than he was earning as an associate general counsel—because Leadbetter was not invited to do so. It was Leadbetter's understanding that Robinson would be recommended for appointment to Vice President without the position being advertised or candidates solicited, all purportedly in violation of the University's employment policies and procedures, the University's affirmative action program and the stipulation of settlement set forth in *Geier v. Alexander*, 593 F.Supp. 1263 (M.D.Tenn.1984)[1].

Leadbetter believed that any under-representation of African-Americans in the University-Wide Administration (the "UWA") administrator classifications in 1999 or 2000 was not due to racial discrimination. Thus, he thought that Gilley's use of race in addressing under- representation was unconstitutional.

---

[1]The University had been involved in long standing desegregation litigation which resulted in a judicial finding of *de jure* racial segregation of public higher education in Tennessee, including at the University. After a challenge was raised to the dual system of higher education in Tennessee, the State of Tennessee, including the University, was ordered by the District Court for the Middle District of Tennessee to submit a "plan designed to effect such desegregation of the higher educational institutions of Tennessee." *Sanders v. Ellington*, 288 F.Supp. 937, 942 (M.D.Tenn.1968). The University entered into a stipulation of settlement which was approved by the district court and this Court alike. *See Geier v. Alexander*, 593 F.Supp. 1263 (M.D.Tenn.1984); *Geier v. Alexander*, 801 F.2d 799 (6th Cir.1988), respectively.

On November 30, 2000, Leadbetter filed a reverse gender and race discrimination action against Gilley under 42 U.S.C. §§ 1981 and 1983, the Fourteenth Amendment of the United States Constitution, and the Tennessee Human Rights Act, TENN. CODE ANN. § 4-21-101, *et seq*. Leadbetter claimed that from the time Gilley was employed, Gilley repeatedly articulated his intent to hire and promote women and minorities. Gilley would describe the promotion system at the University as sort of "inbreeding" for the promotion of white males, but used the phrase "natural chain of progression" when a woman was promoted. He insisted that search committees seek out women and minorities for University jobs.

According to Leadbetter, Gilley requested a job description to be prepared for the Vice President, General Counsel, and Secretary position which specifically favored Mizell and limited or excluded any serious competition. Leadbetter also asserted that the appointment of a search committee composed of a single person—Roger Dickson—was unprecedented at the University for a high level position and that Dickson's appointment fell outside the University's pattern and practice of appointing minorities and women to search committees. Furthermore, Leadbetter claimed that Mizell failed to adequately specify lease payments when she created the agreement transferring the University Hospital and that a minimal investigation of Mizell's credentials would have revealed that she had minimal trial experience.

As to Robinson, Leadbetter stated that Gilley did not advertise the position of Equity and Diversity Administrator prior to Robinson's appointment and did not consider any other candidates for the position because Gilley intended for Robinson to have the position because Robinson was African-American. Leadbetter claimed that Gilley selected the bachelor degree-less Robinson over a number of qualified individuals who were already in the "natural chain of progression" including white employees Sarah Phillips and Jennifer Richter. According to Leadbetter, Gilley would not

have promoted any white male lacking a college degree to the position of Equity and Diversity Administrator.

Gilley ultimately moved for summary judgment. According to Gilley, Leadbetter was not in any way within his contemplation when he named Robinson as one of five staff vice presidents in August 2000 for several reasons. The additional responsibilities added at the time (oversight for affirmative action offices in Memphis and Tullahoma, Tennessee) were a small incremental addition to Robinson's existing position. There was no "vacancy" and no other "candidate" because Robinson was already performing the large majority of the job. Gilley claimed there was no reason for him to consider Leadbetter for a staff vice president job because Leadbetter was not on the president's staff whereas Robinson was. Leadbetter did not inform Gilley that he was interested in a diversity/affirmative action position, even after Gilley had appointed Robinson to the Equity and Diversity Administrator position. Moreover, Gilley had no reason to believe that Leadbetter would be interested in a position paying $11,400 less than Leadbetter was making at the time.

Gilley further asserted that he reasonably believed that the assignment of responsibilities as Equity and Diversity Administrator and Vice President of Equity and Diversity to Robinson was a lawful and permissible affirmative action decision consistent with the objectives of the stipulation of settlement entered in *Geier*. According to Gilley, since the entry of the stipulation of settlement, the district court has not found that the University fully satisfied its constitutional duty under the Equal Protection Clause to dismantle the former *de jure* system of segregation.

Gilley stated that pursuant to the *Geier* stipulation, the University submitted certain desegregation goals to the district court. The positions of Equity and Diversity Administrator and Vice President for Equity and Diversity fell within the UWA. According to Gilley, in 1999 and 2000, the UWA had a substantial under-representation of

African-Americans in the administrator classification. Gilley stated that he was aware of the substantial under-representation of African-Americans in the UWA positions and based his decisions regarding the responsibilities assigned to Robinson, and the resulting title changes, in part, upon the fact that the decisions were consistent with the objectives of the *Geier* settlement. Gilley asserted that he believed that the consideration of race was allowable in assigning these affirmative action responsibilities to Robinson, was lawful under the *Geier* settlement and consistent with the University's duty under the Equal Protection Clause of the Fourteenth Amendment to take remedial steps to dismantle the former *de jure* segregated system of public higher education.

The district court granted Gilley's summary judgment motion, concluding that Leadbetter failed to establish a prima facie case of reverse gender or race discrimination. The district court also found that Gilley was entitled to qualified immunity. Leadbetter timely appealed the district court's decision.

## II.  STANDARD OF REVIEW

The Court reviews a district court's grant of summary judgment de novo. *Williams v. Gen'l Motors Corp.*, 187 F.3d 553, 560 (6th Cir.1999). To grant a motion for summary judgment, a court must find that the pleadings, together with the depositions, interrogatories and affidavits on file, establish that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56.

The party that seeks summary judgment bears the initial burden of specifying the basis upon which it contends judgment should be granted and of identifying that portion of the record which, in its opinion, demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

Thus, summary judgment should be granted only where there is no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Once a movant satisfies its burden, the nonmoving party must produce specific facts demonstrating a genuine issue of fact for trial if it is to withstand summary judgment. *Id.* 477 U.S. 247-48, 106 S.Ct. 2509-10. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* 477 U.S. at 252, 106 S.Ct. at 2512.

## III. ANALYSIS

To establish a prima facie discrimination claim, a plaintiff must show: (1) that he is a member of a protected class; (2) that he applied and was qualified for a promotion; (3) that he was considered for and denied the promotion; and (4) other employees of similar qualifications who were not members of the protected class received promotions. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Sutherland v. Michigan Dept. of Treasury*, 344 F.3d 603, 614 (6th Cir. 2003)(citation omitted). The Sixth Circuit has adapted this four-prong test to cases of reverse discrimination, where a member of the majority is claiming discrimination. *Sutherland*, 344 F.3d at 614-15 (6th Cir. 2003); *Pierce v. Commonwealth Life Ins.*, 40 F.3d 796, 801 (6th Cir.1994). In such cases, a plaintiff satisfies the first prong of the prima facie case by "demonstrat[ing] 'background circumstances [to] support the suspicion that the defendant is that unusual employer who discriminates against the majority.'" *Id.* (citations omitted). To satisfy the fourth prong in a reverse-discrimination case, the plaintiff must show that the defendant treated differently employees who were similarly situated but were not members of the protected class. *Id.*

Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to offer a legitimate,

non-discriminatory reason for the adverse employment action at issue. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (citing *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817)). If the defendant meets this burden, the burden of production shifts back to the plaintiff to demonstrate that the proffered reason is a pretext. *Id.* When the burden shifts back to the plaintiff, the plaintiff must come forward with evidence that the defendant's reason for the employment action is false. *Sutherland*, 344 F.3d at 615 (6th Cir. 2003). "[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit" a finding of unlawful discrimination. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

### A.  Leadbetter's Reverse Gender Discrimination Claim

There is no dispute that Leadbetter sought and was qualified for the General Counsel position. However, the district court found that Leadbetter failed to establish a prima facie case of discrimination because he did not show that Gilley was the unusual employer who discriminates against men and because he failed to show that Gilley treated differently employees who were similarly situated but were not members of the protected class. Leadbetter claims the district court erred in both respects.

Leadbetter contends that the district court improperly credited Gilley's witnesses "on all contested points" and disproportionately relied on evidence favorable to Gilley. Leadbetter also contends that "[a]lthough there is no direct evidence Gilley discriminated against [him] on the basis of . . . gender, there is ample direct evidence of Gilley's discriminatory animus in favor of women . . . ." Specifically, Leadbetter contends that Gilley's claim in an e-mail that women are more efficient than men and his use of the term "inbreeding" to describe the advancement of white males at the University and "natural chain of progression" to describe

female and minority advancement indicates gender animus. Furthermore, Leadbetter argues that Gilley's animus could be inferred from a statement he made during a search for a Dean of Students position where Gilley said that there are women and minorities out there, "go find one."

If the Court were to assume, for the sake of argument, that Leadbetter presented sufficient evidence to raise an inference of gender bias, Leadbetter's gender discrimination claim still fails. "In order for two or more employees to be considered similarly-situated for purposes of creating an inference of disparate treatment in a [reverse discrimination case], the plaintiff must prove that all of the relevant aspects of his employment situation are 'nearly identical' to those of the [female employee] who he alleges [was] treated more favorably." *Pierce*, 40 F.3d at 802. The similarities between the plaintiff and the female employee must exist "in all relevant aspects of their respective employment circumstances." *Id.* Differences in job title, responsibilities, experience, and work record can be used to determine whether two employees are similarly situated. *Id.*

The minimum qualifications for the University's General Counsel position were: (1) J.D. or L.L.B. from an accredited law school; (2) admission to, or immediate eligibility for, the Tennessee State Bar; (3) a minimum of fifteen years of legal practice experience, at least ten of which must have been as full-time, in-house counsel for a multi-campus, public institution of higher education; (4) experience in transactional matters and civil litigation; (5) strong analytical skills and (6) understanding of and commitment to affirmative action and to achieving the University's affirmative action objectives. Although Leadbetter claimed that Gilley had Dickson "tailor" these requirements to favor Mizell, Leadbetter offered the district court no evidence to substantiate his assertion. Similarly, Leadbetter presents no evidence on appeal to suggest that Dickson skewed the job posting to benefit Mizell. Because there is no evidence to show that the job posting was

tainted, the Court moves on to compare the relative qualifications of Mizell and Leadbetter.

Mizell met all of the job requirements for General Counsel. She served as Brogan's "top assistant," having been promoted over Leadbetter six years prior to Brogan's retirement. She managed the General Counsel's staff and budget, reviewed other attorneys' work, and handled the most complex legal issues facing the University (*i.e.* the $225 million transfer of the University's hospital to a not-for-profit organization). Mizell was also recommended by the University's president, three top administrators, Dickson—the University's one-person search committee for the General Counsel spot, and Brogan—the outgoing General Counsel who supervised Mizell and Leadbetter for many years. In Dickson's opinion, Mizell was the "one candidate who stands above the others" and who was "uniquely qualified."

Leadbetter held a lower position than Mizell at the General Counsel's Office, and he had no experience as chief legal officer or first assistant to the chief. He had no experience working with the governing board of a multi-campus public university, and his academic credentials did not match Mizell's academic achievements. Furthermore, he had been removed from responsibility for the Memphis litigation following a series of mishaps that included inadequate preparation and the presentation of perjured testimony.

As these facts show, Leadbetter was not similarly situated to Mizell. Mizell was a better candidate in terms of academic achievement, experience, and work record. She had superior experience managing the General Counsel's office, and she alone was recommended by the University's top brass. Thus, Mizell and Leadbetter were not similarly situated.

Even if Leadbetter had shown that he and Mizell were similarly situated, his discrimination claim still would fail. If Leadbetter was able to show that he and Mizell were similarly situated, the burden would shift to Gilley to offer a legitimate

nondiscriminatory reason for not hiring him as General Counsel. *Burdine*, 450 U.S. at 253 (citing *McDonnell Douglas*, 411 U.S. at 802). Leadbetter would then have to had shown that Gilley's proffered reasons were pretextual by showing that they: (1) had no basis in fact; (2) did not actually motivate Gilley's decision; (3) were not sufficient to warrant Gilley's hiring decision. *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000).

Leadbetter tried to show that Gilley's reasons for hiring Mizell had no basis in fact by arguing that Mizell had absolutely no litigation experience. In Leadbetter's view, Mizell had no litigation experience because she did not take depositions and did not make court appearances. Leadbetter has a self-serving and narrow view of the phrase "litigation experience." Mizell's management of the General Counsel staff, oversight of attorneys' work, and authorship of the University's only successful petition for certiorari to the United States Supreme Court are very significant litigation experience, even if the experience was not earned in court. Leadbetter claimed that Mizell's qualifications did not actually motivate Gilley's decision to hire her since Gilley made up his mind to hire Mizell as soon as he heard that Brogan was retiring. While it appears that Gilley was interested in immediately naming Mizell as Brogan's successor once he learned of Brogan's intended retirement, Gilley wanted to do this because Mizell was qualified, competent, and could hit the ground running. Thus, Gilley had legitimate nondiscriminatory reasons for hiring Mizell.

### B. Leadbetter's Reverse Race Discrimination Claim

Gilley believed that by naming Robinson Equity and Diversity Administrator and then giving Robinson the title of Vice President of Equity and Diversity, he was lawfully attempting to remedy the under-representation of blacks in the University's administration pursuant to the University's settlement in *Geier*. This makes it clear that Robinson's race was a positive factor in Gilley's selection. Since Associate

Vice President Robert Levy testified that the University had eliminated all vestiges of racial discrimination prior to Robinson's hiring, and the University's chief affirmative action officer asserted that the University never approved race as a "plus factor" or positive factor in employment decisions, one could conclude that Gilley's consideration of Robinson's race demonstrates "background circumstances [to] support the suspicion" that Gilley discriminates against whites. *Sutherland*, 344 F.3d at 614-15.

Be this as it may, Leadbetter never applied to be Equity and Diversity Administrator or Vice President of Equity and Diversity. He tries to overcome this problem by arguing that his failure to apply should be excused because he had no opportunity to do so. This Circuit has recognized that in certain situations it is not necessary for a Title VII plaintiff to apply for a position in order to assert a claim. *Wanger v. G.A. Gray Co.*, 872 F.2d 142 (6th Cir.1989); *Nguyen v. City of Cleveland*, 229 F.3d 559, 564 (6th Cir. 2000). In *Nguyen*, the Court held that a plaintiff failed to satisfy *Wanger*'s lenient application requirement. In that case, the plaintiff did not submit authority showing that the City was required to post a position and he offered no support for his claim that "the record is clear that [he] would have applied had he known of the posting." Because the plaintiff pointed to no evidence demonstrating that he showed more than a general interest in the position and pointed to no evidence supporting his assertion that his application for the position would have been fruitless[2], the Court held that the plaintiff failed to demonstrate a prima facie case as to his nonpromotion and affirmed the district court's grant of summary judgment. *Nguyen*, 229 F.3d at 564.

---

[2]A plaintiff's failure to apply can be excused as "fruitless" if, for instance, a defendant had a "whites only" job requirement. *See Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977).

While Gilley and Leadbetter dispute whether the University was required to advertise the positions Robinson secured and whether the positions were even vacancies[3], Leadbetter has clearly failed to show that he would have applied had he known of the position. At best, Leadbetter states that he might have been interested in becoming Equity and Diversity Administrator if he could have been paid more than the $55,000 Robinson earned in that capacity. This is a statement of general interest, it is not evidence that Leadbetter would have applied for the position. Furthermore, Leadbetter offers no evidence to show that the University had a blacks only hiring requirement that would have made his failure to apply fruitless.

In addition to his failure to apply, Leadbetter fails to show that he and Robinson were similarly situated candidates for the position of Vice President of Equity and Diversity. The bulk of the vice president's responsibilities were those that Robinson had performed during his eight months as Equity and Diversity Administrator. As such, Robinson had actual experience performing the vice president's duties. Leadbetter lacked that experience. This critical difference is enough to

---

[3]Gilley argues that the University policy did not ordinarily consider a change in job title as a result of expansion of existing responsibilities, or the assumption of additional duties, to be a vacancy. *See* Gilley's Br. at p.51. Since Robinson was merely given a new title and additional responsibilities, Gilley contends that Robinson's position was never a vacancy and the University, therefore, was not required to advertise the position. Leadbetter argues that the University policy allowed Gilley to transfer Robinson among departments, but the University had no express policy regarding the reorganization Gilley engineered. In Leadbetter's opinion, Gilley's reorganization created a new position—Vice President of Equity and Diversity—and a vacancy. Whatever the case may be, resolution of this issue is unnecessary since Leadbetter never applied to fill the vice presidency.

show that Robinson and Leadbetter were not similarly situated. *Pierce*, 40 F.3d at 802[4].

### CONCLUSION

For the foregoing reasons, the district court's decision is AFFIRMED.

---

[4]Due to the fact that Leadbetter failed to establish a prima facie case of discrimination, the Court need not consider qualified immunity or any additional issues.