**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a0264n.06

**No. 10-2064**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

KATHLEEN LEAVEY,

      **Plaintiff-Appellant,**

v.

CITY OF DETROIT AND
MARYLIN E. ATKINS,

      **Defendants-Appellees.**

_____ /

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MICHIGAN

**FILED**

*Mar 09, 2012*

LEONARD GREEN, Clerk

BEFORE:    SILER, CLAY, and ROGERS, Circuit Judges.

**CLAY Circuit Judge.** Plaintiff Kathleen Leavey, a public official previously employed by

the City of Detroit, appeals the district court's grant of summary judgment in favor of Defendant City

of Detroit ("the City"), and Defendant Judge Marylin E. Atkins ("Judge Atkins"). Plaintiff brought

claims of First Amendment retaliation under 42 U.S.C. § 1983, and reverse discrimination under the

Michigan Elliott-Larsen Civil Rights Act, M.C.L.A. §37.2201 *et seq*. and the Fourteenth

Amendment, against the City following her resignation from her position as Interim Corporation

Counsel for the City. Plaintiff also filed a First Amendment retaliation claim under 42 U.S.C. §

1983 against Judge Atkins in her individual capacity.

For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## BACKGROUND

Plaintiff, who is white, was appointed to the position of Interim Corporation Counsel by Mayor Kenneth Cockrel, who is African American, as an at-will mayoral appointee in September 2008.

On January 14, 2009, Plaintiff participated in a conference call with Dennis Mazurek ("Mazurek"), Chief Assistant Corporation Counsel for the City, and Constance Allen ("Allen"), judicial assistant to Defendant Atkins, Chief Judge of the 36th District Court for the City of Detroit. Mazurek and Allen are both white and Atkins is African American. The purpose of the conference call was to discuss the City's failure to pay the judgment in the amount of $424,000 against the 36th District Court in the case of *Sciotti v. 36th District Court*, 2007 WL 1491809 (Mich. App. 2007). According to Plaintiff, there was a dispute over which City budget would fund the judgment. During the conference call, the conversation shifted from discussing the need to pay the judgment to complaints about the operation of the 36th District Court. According to the amended complaint, Mazurek stated that the 36th District Court was a "part-time" court whose judges started late in the morning and were never available in the afternoon. Plaintiff then added the following statement:

> you know, Connie, you know, people don't have a lot of respect for your
> court, or they don't - - you know, your court is like a ghetto court. You treat
> people terrible over there. You know, they wait in lines all day long.

(R.49–5: Leavey Dep. 68.) The conference call ended shortly after Plaintiff's remark about the court.

After the conference call, Allen contacted Judge Atkins and informed her of Plaintiff's and Mazurek's comments about the 36th District Court. Judge Atkins requested that Allen send an email stating her recollection of the conference call. Judge Atkins then forwarded the email from Allen

2

to the City's Deputy Mayor, Saul Green, who is also African American.  Judge Atkins also called

Deputy Mayor Green and informed him of the conversation that occurred between Plaintiff, Mazurek

and Allen, and reported that Plaintiff had referred to the court as "ghetto."  Judge Atkins also

indicated that she was going to send a letter to Mayor Cockrel and to members of the Detroit City

Council stating that she was offended by the remark, and that she believed it was a racist statement.

Deputy Mayor Green indicated that he would look into the matter.

On January 15, 2009, Deputy Mayor Green called Plaintiff to discuss the conference call

from the prior day.  Initially Plaintiff denied using the phrase "ghetto court" but acknowledged that

the discussion between her and the two other court officials was pretty heated.  She also explained

that the discussion was more about the operation of the 36th District Court and how in her opinion

the court is disorganized and regularly mistreats people.  After the conversation, Deputy Mayor

Green forwarded the email that he received from Judge Atkins to Plaintiff, but Plaintiff was unable

to open the email.  Plaintiff sent a separate email to Deputy Mayor Green admitting that she did in

fact make the "ghetto" remark.  In her email she acknowledged the following:

> I imagine that this will upset many people. I did use the term I have to admit. This
> could be damaging to the mayor and the city. There may be only one solution to all
> who will want a pound of flesh and that is for me to resign and proceed to retirement.
> This is an embarrassment to the city and the mayor.  Nothing I can say or do will
> assuage those who will be incensed and outraged by the comment.

(R.59–11: Leavey email to Green.)

Plaintiff arrived at her office later that morning and read the email forwarded by Deputy

Mayor Green that was sent by Judge Atkins.  Plaintiff then sent a second email to Deputy Mayor

Green indicating that Judge Atkins' email misrepresented the facts, that the recollection of the

conversation was inaccurate, and that she was rescinding her offer to resign. Plaintiff later sent a third email to Deputy Mayor Green in the early afternoon to explain in further detail the context of the "ghetto" remark. Plaintiff also stated that she was not going to resign and would defend her comments.

Plaintiff met with Deputy Mayor Green in person in the afternoon of January 15, 2009. There is no indication that Deputy Mayor Green read the emails from Plaintiff prior to their meeting. During the meeting, Plaintiff discussed the conference call from the prior day and she admitted to using the term "ghetto" in describing the 36th District Court. Plaintiff argued that her use of the term was not racist but was used to describe the court as dysfunctional. At the end of the meeting, Deputy Mayor Green told Plaintiff that she could not stay in her position as Interim Corporation Counsel and that he needed to discuss the situation with the Mayor.

Plaintiff submitted her resignation letter to Mayor Cockrel, effective January 15, 2009. Mayor Cockrel and Deputy Mayor Green met later that afternoon to discuss Plaintiff's statements and Deputy Mayor Green's conversations with Plaintiff and Judge Atkins. Ultimately, Deputy Mayor Green recommended to Mayor Cockrel that Plaintiff leave her position. Mayor Cockrel agreed with the recommendation. Mayor Cockrel stated in his deposition in this case that his decision to accept Plaintiff's resignation was based on the fact that there was a:

> comment and [ ] a discussion that in my view could have negatively impacted and influenced future dealings between the Law Department and the City of Detroit in general, not only with the 36th District Court but which would also have affected the credibility of the Law Department and the head of the Law Department in dealings with the City Council, that was my concern.

(R.59–4: Mayor Cockrel Dep. 17.)

On January 20, 2009, Plaintiff sent an email to Mayor Cockrel rescinding her resignation. A week after Plaintiff sent the January 15, 2009 email, Mayor Cockrel sent Plaintiff a letter backdated to January 15, 2009, accepting her resignation. After Plaintiff's resignation, she returned to her former civil service position with the City as the Senior Assistant Corporation Counsel; she voluntarily retired from that position in July 2009.

Plaintiff filed her original complaint in this matter on April 7, 2009. The district court dismissed all claims in her complaint against the 36th District Court and Judge Atkins on the basis of governmental immunity. Plaintiff filed an amended complaint alleging a First Amendment retaliation claim under 42 U.S.C. § 1983 against Judge Atkins in her individual capacity as well as against the City. In addition, Plaintiff also raised a reverse race discrimination claim under the Michigan Elliot-Larsen Civil Rights Act pursuant to M.C.L.A. §37.2201 *et. seq*. and the Fourteenth Amendment against the City. After the close of discovery, the City of Detroit and Judge Atkins independently filed motions for summary judgment. The district court granted Defendants' motions on June 24, 2010. Plaintiff then filed a motion for reconsideration, which was denied by the district court on July 27, 2010. Plaintiff now appeals.

## DISCUSSION

We review a district court's grant of summary judgment *de novo*. *Wuliger v. Mfrs. Life Ins. Co.*, 567 F.3d 787, 792 (6th Cir. 2009). Evidence in the record is viewed in the light most favorable to the nonmoving party, and all reasonable inferences are drawn to the benefit of that party. *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 576–77 (6th Cir. 2004) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). Summary judgment is appropriate only where the evidence raises no genuine

issues of material fact "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**A.      Reverse Race Discrimination Claim**

Plaintiff brings forth a reverse race discrimination claim alleging that Deputy Mayor Green and Mayor Cockrel forced her to resign over her use of the word "ghetto" to describe the 36th District Court and that she would have maintained her position if she were African American.

In *McDonnell Douglas v. Green*, 411 U.S. 792 (1973), the Supreme Court established the general framework for circumstantial or indirect case of employment discrimination, which was later modified by *Tex. Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981). The three-part analysis allows a plaintiff to prove a case of racial discrimination if (1) he establishes a prima facie case of discrimination; (2) the employer offers evidence of a legitimate, nondiscriminatory reason for its actions; and (3) the plaintiff proves that the reason offered is in fact a pretext for intentional discrimination. *McDonnell Douglas*, 411 U.S. at 802.

In reverse discrimination cases, the *McDonnell Douglas* framework is modified to show that the employer discriminates against a member of the majority. *See McDonnell v. Santa Fe Trail Trans.*, 427 U.S. 273, 280 (1976) (holding that both the Civil Rights Act of 1870 and Title VII of the Civil Rights Act of 1964 prohibit racial discrimination in private employment against white persons as well as against nonwhites). *See also Murray v. Thistledown Racing Club, Inc.*, 770 F.2d 63, 67 (6th Cir. 1985) (stating that "reverse discrimination claims require application of a *McDonnell Douglas* standard modified to reflect this context as well as the factual situation of the claim"). A plaintiff may establish a prima facie case for reverse discrimination by showing: (1) that

6

"background circumstances exist to support the suspicion that the defendant is the unusual employer that discriminates against the majority;" (2) that Plaintiff "was qualified for the job;" (3) that Plaintiff "suffered an adverse employment decision;" and (4) that Plaintiff was "treated differently than similarly situated non-protected employees." *Arendale v. City of Memphis*, 519 F.3d 587, 603 (6th Cir. 2008) (internal citations and quotation marks omitted).

After a plaintiff has established a prima facie case of reverse discrimination, the burden shifts to the defendant "to offer a legitimate, non-discriminatory reason for the adverse employment action at issue." *Leadbetter v. Gilley*, 385 F.3d 683, 690 (6th Cir. 2004) (internal citations omitted). Once the defendant meets this burden, "the burden of production shifts back to the plaintiff to demonstrate that the proffered reason is a pretext" and the "plaintiff must come forward with evidence that the defendant's reasons for the employment action is false." *Id*.

### 1. Background Circumstances

The first prong of establishing a prima facie case of reverse race discrimination focuses on the background circumstances.[1] Plaintiff must show that the City is that "unusual employer" who discriminates against the majority. The mere fact that a racial minority took an adverse action against Plaintiff is sufficient to satisfy the background circumstances requirement. *See Arendale*, 519 F.3d at 603 (citing *Zambetti v. Cuyahoga Cmty Coll.*, 314 F.3d 249, 257 (6th Cir. 2002) (finding

---

[1]Michigan courts analyze discrimination cases under the same framework as federal law. *See Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999). Under Michigan law, a plaintiff alleging reverse discrimination does not have to satisfy the "background circumstances" prong. *See Lind v. City of Battle Creek*, 470 Mich. 230, 233 (2004). For purposes of the state law analysis, Plaintiff must only demonstrate that she was qualified for the position, suffered an adverse action, and was treated differently than a similarly situated non-Caucasian.

that "the person in charge of hiring CCC, Chief Harris, was himself African American. This is sufficient in our opinion to satisfy *Murray's* background circumstances requirement").

In this case, the primary decision makers involved in Plaintiff's resignation, Mayor Cockrel and Deputy Mayor Green, were both African American and Plaintiff is white. Therefore, Plaintiff satisfied this prong of our analysis.

### 2. Qualifications

There is no dispute among the parties that Plaintiff was well-qualified for her position as Interim Corporation Counsel for the City of Detroit. In addition, Mayor Cockrel and Deputy Mayor Green stated at their depositions that they were confident in Plaintiff's abilities as an attorney and that she was able to handle the position of corporation counsel.

### 3. Adverse Action

An adverse employment action is defined as "a materially adverse change in the terms and conditions of [a plaintiff's] employment." *White v. Burlington N. & Santa Fe Ry. Co.*, 364 F.3d 789, 795 (6th Cir.2004) (en banc) (quoting *Hollins v. Atlantic Co.*, 188 F.3d 652, 662 (6th Cir. 1999)). A "bruised ego" or a "mere inconvenience or an alteration of job responsibilities" is not sufficient to constitute an adverse employment action. *White*, 364 F.3d at 797. In addition, an adverse employment action is not characterized by dissatisfying an employee. *Spees v. James Marine Inc.*, 617 F.3d 680, 691 (6th Cir. 2010) (citing *White*, 364 F.3d at 797). *See also Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 780 (7th Cir. 2007) (citing *O'Neal v. City of Chicago,* 392 F.3d 909, 911 (7th Cir. 2004) (explaining that adverse employment actions may "extend beyond readily

quantifiable losses, [but] not everything that makes an employee unhappy is an actionable adverse action").

In this case, Plaintiff's resignation from her position as Interim Corporation Counsel represents an adverse action. Adverse employment actions typically involve a "significant change in employment status," including "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *White*, 364 F.3d at 798 (quoting *Burlington Indus. v. Ellerth*, 524 U.S. 742, 761 (1998)). The fact that Plaintiff was demoted to her former civil service position with the City as the Senior Assistant Corporation Counsel constitutes an adverse employment action.

### 4. Disparate Treatment for Similarly Situated Employees

Plaintiff claims that her reverse race discrimination claim should prevail because she was replaced in her position as Interim Corporation Counsel by a non-white employee. Although Plaintiff was replaced with a non-white employee, there is no evidence to suggest that a non-white employee in a position similar to Plaintiff's behaved similarly to Plaintiff yet was not disciplined by Plaintiff's employer. We find no evidence in the record that the City's decision to accept Plaintiff's resignation was based on race.

To satisfy the fourth prong, Plaintiff "bears the burden of demonstrating that [she] was intentionally discriminated against despite [her] majority status." *Arendale*, 519 F.3d at 603. (internal citation and quotation marks omitted). Mayor Cockrel denied that race was a factor in accepting her resignation, and we find no evidence of a racial motive by any mayoral employee.

9

Mayor Cockrel stated at his deposition that he was concerned about the relationship between the City and the law department as well as his relationship with the City Council. He stated:

> To me I thought the real issue, the real concern as I mentioned earlier was that this conversation was something that could potentially negatively impact and influence the dealings between the City and the dealings between the Law Department and the court for a long time to come. I also had concerns about how it would impact the dealings of my administration at that time and the Detroit City Council because the leadership of Council, maybe not the entire Council, but I know for a fact the president and the president pro tem city council were already - - had been made aware of this, and the president pro tem had actually spoken with Deputy Mayor Green and was extremely concerned about the conversation, what had been said, and what was going to happen from there on in.

(R.59–4: Mayor Cockrel Dep. 25–26.)

Deputy Mayor Green did not mention race as the reason for recommending Plaintiff's resignation. Deputy Mayor Green believed that Plaintiff used poor judgment in her choice of words but denied that Plaintiff was a racist or that race was a factor for her dismissal. Plaintiff does not provide any evidence that race was a contributing factor to her termination. The record simply does not reveal any evidence that anyone from the City was motivated to terminate Plaintiff because of her race. The record does show that the City discovered that Plaintiff made an inappropriate comment about a court where the City has a number of cases pending, and that such conduct should not be made by a public official.[2] Because Plaintiff failed to show that she was "treated differently

---

[2] It should also be observed that the record was void of any evidence of racial animus towards Plaintiff. She has held a number of appointments to positions of significance by past and present mayors of the City of Detroit, all of whom were African American. Plaintiff's race was never an impediment in her assuming positions of high profile responsibility. For example, in 1993 Mayor Coleman Young appointed Plaintiff as the Deputy Director of the Water and Sewerage Department. In 2000, Mayor Dennis Archer appointed Plaintiff as the Interim Director of the same Department. Although Plaintiff lost her position under Mayor Kwame Kilpatrick, who preceded Mayor Cockrel, she resumed her previous position with the City's law department.

than similarly situated non-protected employees," she did not establish a prima facie case of reverse race discrimination.

## B. First Amendment Retaliation

Plaintiff also raises a First Amendment retaliation claim alleging that Defendants, the City and Judge Atkins, retaliated against her for criticizing the 36th District Court, thereby resulting in the City's termination of her position.

In order to survive summary judgment on a First Amendment retaliation claim, Plaintiff must present sufficient evidence to create a triable issue of fact as to each of the following elements:

> (1) the plaintiff engaged in constitutionally protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) the adverse action was motivated at least in part by the plaintiff's protected conduct.

*Mezibov v. Allen*, 411 F.3d 712, 717 (6th Cir. 2005) (citing *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc)). This inquiry is context driven and "the underlying concepts that [the elements] signify will vary with the setting–whether activity is 'protected' or an action is 'adverse' will depend on [the] context." *Thaddeus-X*, 175 F.3d at 388. "[I]f the plaintiff establishes the three elements, the burden of production then shifts to the defendants to show that their actions would not have been different absent the plaintiff's protected conduct." *Smith v. Craven*, 61 F. App'x 159, 161 (6th Cir. 2003) (citing *Thaddeus-X*, 175 F.3d at 400)).

## 1. Plaintiff's Claim against the City

In order for Plaintiff to prevail on her retaliation claim against the City, we must first determine whether Plaintiff was engaged in constitutionally protected conduct. Under this first step, we must decide as a question of law whether Plaintiff was speaking as a citizen or as part of her

official duties as the Interim Corporation Counsel. *Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 542 (6th Cir. 2007). "The First Amendment protects a public employee's right, in certain circumstances, to speak as citizens addressing matters of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). However, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421. In *Garcetti,* relying on *Pickering v. Board of Education*, 391 U.S. 563 (1968), the Supreme Court established the relevant inquiry to guide our First Amendment analysis for public employee speech. *Garcetti* held that a court must determine:

> whether the employee spoke as a citizen as a matter of public concern. If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech. If the answer is yes, then the possibility of a First Amendment claim arises. The question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public. This consideration reflects the importance of the relationship between the speaker's expressions and employment. A government entity has broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations.

*Garcetti*, 547 U.S. at 418 (internal citations and quotations omitted).

A public concern is defined as relating to "any matter of political, social, or other concern to the community." *Connick v. Myers*, 461 U.S. 138, 146 (1983). "Because of the need to provide government officials with the ability to manage their offices without 'intrusive oversight by the judiciary,' . . . our concern must be to protect those expressive activities of a public employee when he speaks as a citizen on a public matter; that concern ordinarily does not extend to a public employee's speaking as an employee on matters only of his personal interest." *Gragg v. Kentucky*

*Cabinet for Workforce Dev.*, 289 F.3d 958, 965 (6th Cir. 2002) (quoting *Connick*, 461 U.S. at 146–47).

In the instant case, the district court properly analyzed Plaintiff's claim to conclude that she was acting within her official duties when she made her comments about the 36th District Court. Plaintiff's attempt to distinguish between statements made in conjunction with her job and statements made unrelated to her job is unconvincing. The district court properly found that Plaintiff's complaint and her deposition testimony provided evidence that Plaintiff was acting within her official duties as Interim Corporation Counsel when she made the comments about the 36th District Court. The payment of judgments by the City is identified by the City Charter as an official duty of Plaintiff. According to the City Charter, the Interim Corporation Counsel is responsible for:

> defense of all actions or proceedings against the City; prosecution of all actions and proceedings in which the City was a party or in which the City had a legal interest; prosecution of cases involving violations of city ordinances; representation of officers or employees of the City in matters involving official duties; provision of legal advice and opinions to the Mayor, the City Council, or the City's department heads; drafting or ordinances and resolutions; review and approval of contracts and bonds; and approval of the payment of judgments against the City.

(Def. The City's Br. 8–9.)

Plaintiff further emphasized that her job responsibilities included addressing the payment of judgments against the City by stating at her deposition that she "was doing what my job required, which was to talk about a judgment, find out what had happened and relay that to Mr. Green." (R.59: City's Mot. for Summ. J. Ex. A 144.) In addition, Plaintiff testified that she:

> was concerned about. . . the fact that there was a judgment hanging out there that had not been paid, and I was concerned that this gentleman [Sciotti's attorney] was taking a lot of bizarre action to, you know, satisfy the judgment. And we needed to clean

this up. That's the whole reason for having the conversation is we had to make a decision one way or the other.

(*Id.*)

Plaintiff's attempt to isolate the statement from her official duty is misplaced. She argues in her claim against the City that she engaged in protective speech under the First Amendment because the statements she made in regard to the 36th District Court were not related to her job but "was merely uttered *in conjunction with* her job." (emphasis added). As the record below demonstrates, Plaintiff's speech arose in the context of her official duty as the Interim Corporation Counsel. If Plaintiff truly believed that her official responsibilities did not include issues related to the payment of court judgments then she would not have made so many attempts to try to resolve this matter. The record shows that Plaintiff first contacted the judicial assistant who handled the trial and after that strategy proved unsuccessful, she took it upon herself to attempt to speak directly with the Court's Chief Judge, Marylin Atkins. Plaintiff then proceeded to schedule a conference call with the Chief Assistant Corporation Counsel and the judicial assistant to address the issue. It was during the course of the plaintiff's professional duty as Interim Corporation Counsel that she made the comments which the Defendants considered inappropriate. *See Haynes v. City of Circleville*, 474 F.3d 357, 364 (6th Cir. 2007) (finding that the plaintiff "was acting as a public employee carrying out [her] professional responsibilities" when she made her remarks and therefore the employee's speech was unprotected). While government employees "do not surrender all their First Amendment rights by reason of their employment," *Garcetti*, 547 U.S. at 417, they "must accept certain limitations on [their] freedom." *Id*. at 418. We find this to include disparaging comments about another governmental entity—in particular, one with which Plaintiff had regular and frequent

14

interactions and was required to work with on a close and cooperative basis. Because Plaintiff cannot prove that her speech was constitutionally protected, she cannot establish a prima facie case for her First Amendment retaliation claim.

### 2. Plaintiff's Claim against Judge Atkins

Plaintiff also raises a First Amendment retaliation claim against Judge Atkins asserting that Plaintiff's speech was protected because it touched upon a matter of public concern.[3] In reviewing the conduct of both Plaintiff and Judge Atkins to determine whether Plaintiff's remarks were intended to address a matter of public concern, the district court considered our analysis in *Farhat v. Jopke*, 370 F.3d 580, 589 (6th Cir. 2004). The district court determined that the "focus" of the speech; the point of the speech in question; purpose to which the employee spoke; the intent of the speech; the communicative purpose of the speaker; and the record, provided sufficient evidence that Plaintiff's remarks were not made to express a matter of public concern. We agree. To the extent that her incidental remarks can be isolated as addressing a matter of public concern, the circumstances do not warrant constitutional protection or give rise to a retaliation cause of action. The record clearly established that Plaintiff was acting in her capacity as Interim Corporation Counsel and not as a concerned citizen.

In the alternative, Plaintiff raises for the first time on appeal that she was engaged in a protected petitioning activity in registering a complaint regarding what she viewed as a dysfunctional

---

[3]Plaintiff alleges in her complaint that "in forwarding the email and letter, Judge Atkins was acting under color of State law, i.e., in her capacity as Chief Judge of the 36th District Court." (R.27: Compl. ¶ 45.)

36th District Court.[4] In *California Transport v. Trucking Unlimited*, 404 U.S. 508, 510 (1972), the Supreme Court established that in a representative democracy the whole concept of representation depends upon the ability of people to exercise the right of petition as one of the freedoms protected by the Bill of Rights. In *Gable v. Lewis*, 201 F.3d 769 (6th Cir. 2000), we applied *California Transport's* definition of the petition clause to hold that the submission of complaints and criticisms by a non-public employee to non-legislative and non-judicial public agencies constitutes petitioning activity protected by the petition clause.

Although Plaintiff's evidence is insufficient on its face to satisfy the requirements of the petition activity as discussed by this court in *Holzemer v. City of Memphis*, 621 F.3d 512 (6th Cir. 2010), we decline to address whether Plaintiff's activity falls under the petition clause because she did not raise this issue below. *See Brickner v. Voinovich*, 977 F.2 235, 238 (6th Cir. 1992) (finding that Plaintiff's constitutional and statutory arguments were not pleaded or preserved in the district court and are therefore waived on appeal). In addition, the more appropriate analysis is under the "public concerns" test, and Plaintiff was acting at all time within her capacity as a public employee.

Judge Atkins argues that Plaintiff's claim fails because she cannot establish a prima facie case of First Amendment retaliation. In addition, Judge Atkins asserts qualified immunity and argues that as a government official she is "shielded from liability from civil damages insofar as [her] conduct does not violate clearly established statutory or constitutional rights of which a

---

[4]Although Plaintiff has consistently maintained during proceedings before the district court and in its brief to this court, that "matters of public concern" were raised during the conversation, Plaintiff now urges this Court to rely not on cases involving "matters of public concern" but instead view her complaint as a petition clause activity.

reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1983). Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction and liability when they reasonably perform their duties. The protection of qualified immunity applies regardless of whether the government's error is a "mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citing *Groh v. Ramirez*, 540 U.S. 551, 567 (2004)).

Judge Atkins' qualified immunity defense requires a three-step inquiry. The first step requires us to determine whether, "in the light most favorable to the party asserting the injury, . . . the facts alleged show the [ ] conduct violated a constitutional right[.]" *Parsons v. City of Pontiac*, 533 F.3d 492, 500 (6th Cir. 2008) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). We must adopt the plaintiff's version of the facts when reviewing a defense of qualified immunity on a motion for summary judgment. *Scott v. Harris*, 550 U.S. 372, 377 (2007). If the Court decides that a constitutional right was violated then the second step is to "ask whether the right was clearly established." *Saucier*, 533 U.S. at 201. We sometimes apply a third step to "increase the clarity" of the analysis which asks "whether the plaintiff offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights." *Estate of Carter v. City of Detroit*, 408 F.3d 305, 311 n. 2 (6th Cir.2005) (internal citations omitted). In *Pearson*, the Supreme Court recently interpreted the sequence of analysis for qualified immunity as "often appropriate [but] it should no longer be considered as mandatory." 555 U.S. at 236. In applying *Pearson*, we have stated that although courts are "still required to address the same

questions in conducting [the] qualified immunity analysis, [they are now] free to consider those questions in whatever order is appropriate in light of the issues before [them]." *Moldowan v. City of Warren*, 573 F.3d 309, 333 (6th Cir. 2009).

As previously discussed, Plaintiff made her comments about the 36th District Court pursuant to her official duties as the Interim Corporation Counsel. Therefore, Plaintiff's speech is not protected as would be the speech of a citizen commenting on a matter of a public concern. Because Plaintiff cannot establish a constitutional violation consisting of a violation of her First Amendment rights, the defense of qualified immunity applies in the instant action. In the absence of a constitutional violation of Plaintiff's rights, there is no requirement to consider whether the alleged constitutional right was clearly established. *Saucier*, 533 U.S. at 201. Therefore an analysis proceeding with the second step is not necessary to address Judge Atkins qualified immunity defense. *Id.* (stating that "[i]f no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity").

Plaintiff, while acting in her official capacity as the Interim Corporation Counsel for the City of Detroit, engaged in comments that could have adversely impacted relationships between the City and the 36th District Court. Plaintiff is unable to now frame the underlying conversation in the context of a right warranting protection by this Court, as the Constitution does not shield from discipline unprotected expressions made in the context of an individual's official duties. Plaintiff failed to establish a causal connection between any constitutional right or protected action and her termination, and failed to present evidence that she experienced severe and pervasive harassment in retaliation for engaging in activity warranting constitutional protection. Therefore, the district court

18

did not err in granting summary judgment for Defendant the City of Detroit on Plaintiff's claims of First Amendment retaliation and reverse racial discrimination, and for Defendant Atkins on Plaintiff's First Amendment retaliation claim.

## CONCLUSION

For the reasons stated, the judgment of the district court is **AFFIRMED.**