**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 14a0493n.06

**No. 12-3931**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| GRAHAM LYNCH, | ) | |
| | ) | **FILED** |
| Plaintiff-Appellant, | ) | Jul 08, 2014 |
| | ) | DEBORAH S. HUNT, Clerk |
| v. | ) | |
| | ) | ON APPEAL FROM THE |
| ITT EDUCATIONAL SERVICES, INC., aka ITT | ) | UNITED STATES DISTRICT |
| Technical Institute; TONY DAROSA, | ) | COURT FOR THE NORTHERN |
| | ) | DISTRICT OF OHIO |
| Defendants-Appellees. | ) | |
| | ) | |

BEFORE: DAUGHTREY, McKEAGUE, and GRIFFIN, Circuit Judges.

GRIFFIN, Circuit Judge.

Plaintiff Graham Lynch appeals the district court's grant of summary judgment in favor of defendants ITT Educational Services ("ITT") and Tony Darosa in this case involving claims of age and race discrimination under state and federal law. The district court determined that Lynch failed to establish a prima facie case of employment discrimination because there is no evidence that ITT treated a similarly situated employee outside the protected class more favorably. Further, the district court determined that Lynch failed to show that the articulated reason for his termination was pretextual. For the following reasons, we affirm.

I.

ITT is a group of colleges that provides higher education to students in specific technical areas of vocation. The Accrediting Council for Independent Colleges and Schools ("ACICS") sets minimum requirements that must be met for the college or school to obtain and maintain accreditation. For associate's degree programs, ACICS requires instructors teaching courses other than general education to hold a bachelor's degree and "be assigned based on their major and minor academic preparation and/or related experience." Nonetheless, ACICS encourages colleges such as ITT to impose more stringent faculty qualification requirements, and institutions are expected to comply with standards even as they change over time. Allegedly as a measure to avoid jeopardizing its accreditation, ITT requires all instructors to hold a bachelor's degree in a "related area" to their teaching subject and have earned at least fifteen semester hours in "the subject" of their teaching.

In June 2006, ITT hired Lynch as an adjunct instructor at its Warrensville Heights campus to teach courses in information technology ("IT"), including computer programming, network database design, and operating systems. Lynch is an African-American and was born in 1939. He holds a bachelor's degree in Civil Engineering from Ohio University and an MBA from Pepperdine University. His education did not include any IT courses specifically, but he used advanced computing to complete his MBA coursework, such as operations research, forecasting models, statistical inferences and correlations, and regression analyses.

Lynch's work experience relating to computing is extensive. While in the United States Air Force performing work as a civil engineer, Lynch "had a couple of courses in computer

programming and how to interact with the base supply computer." He also "received certificates on how to use the computer system to plan construction and maintenance and planning using program evaluation review techniques and critical path methods." In addition, Lynch underwent computer training while working as a marketing representative for IBM. During his employment with IBM, Lynch "help[ed] customers get their computers up and running and programmed." As a data processing manager at Albert A. Webb Associates, Lynch "was responsible for the computing systems and all the software and everything associated with computing." While working for the Eastern Michigan Water District, he set up programming for sending out utility bills, water analysis, land planning, and payroll. While working for a manufacturer of precision instruments and gun sights for strategic weapons, Lynch managed and implemented the business, accounting, payroll, and financial management aspects of the company's computer system at corporate headquarters. In addition to installing the software and building the computer system from the ground up, Lynch trained accountants and other staff on how to use and control the computing system. His other past employers include the County of Riverside and Science Application International Corporation; both positions required extensive computer knowledge. As far as teaching experience, Lynch has been an adjunct instructor in the areas of IT, computer science, and business at Riverside Community College, Chapman, and Brown Mackie College.

Nonetheless, Lynch admitted at his deposition that a bachelor's degree in Civil Engineering is not related to IT: "[IT] has to do with all the realm of computers, networks, [and] multi media" and "civil engineering has to do with construction, dams, roads, [and] highways." He also admitted

that he has not earned fifteen semester hours in the subject of IT. Thus, he acknowledged that he does not meet the requirements to teach IT at ITT. Yet, as Lynch explained, "I was still hired. Somebody found me fit."

Allegedly, Lynch's lack of credentials was not discovered until nearly two years after his hire during a routine audit in preparation for a visit and accreditation review by ACICS. At the time, Ann Contiguglia was the school director of the Warrensville Heights campus, and Ronald McClendon was the dean. McClendon, who is African-American, recalls Contiguglia approaching him with a complaint from a student that Lynch had made racial remarks in the classroom. McClendon spoke with Lynch and the student, and to McClendon's satisfaction, the claim was baseless. Nonetheless, Contiguglia maintained that "[h]e's got to go." Asked whether he believed age or race played a factor in Lynch's termination, McClendon stated: "I don't know specifically that race or age was a factor in the way that [Contiguglia] treated him, but I do believe that [she] had a certain set of behaviors and demeanor with black male faculty that would cause me to believe that she either took us very much for granted or that she didn't value us very much." Asked why he thought Contiguglia undervalued black male faculty, McClendon said that she talked "condescendingly, aggressively, and at times with flirtation" to them. In McClendon's opinion, Contiguglia treated black males differently.

Ronald Lewellen replaced McClendon as dean in October 2008. Contiguglia told Lewellen, as she had told McClendon, that Lynch had to go. Asked whether he had ever heard Contiguglia make negative comments regarding Lynch's age or race, Lewellen testified, "[m]aybe some

comments about his age, but I don't recall . . . anything that I could say that's definitely racial." Nevertheless, Lewellen believes that age and race played a factor in Lynch's termination and that Contiguglia used Lynch's alleged lack of qualifications as an excuse to fire him. He recalls rumors going around that Contiguglia "didn't particularly care for [Lynch]" and had "some professional jealousy in regard to [his] positive relationships with students." According to Lewellen, Contiguglia "was not respected or liked very much by professionals" because of her fiery temper. Lewellen thinks that Contiguglia's decision to terminate Lynch was personal as opposed to professional.

But Contiguglia was not the final decision-maker. Contiguglia reported to Darosa, the district manager, who she claims would have made the decision to terminate Lynch. Further, Contiguglia was herself fired on November 12, 2008, several days before Lynch's termination.

According to Darosa, he decided to terminate Lynch because he did not meet the job requirements imposed by ITT or ACICS. He discovered Lynch's lack of qualifications after being approached by the dean and director of the Warrensville Heights campus during a visit. No other employees falling short of the requirements were brought to Darosa's attention. Darosa reviewed Lynch's resume, saw that he did not meet the job requirements, and concluded that a mistake must have been made in hiring him in the first place. During a meeting with Lynch, Darosa asked Lynch if there was anything missing on his resume that would qualify him to teach IT. Lynch thought that his experience should be enough, but he admitted that his academic transcripts did not qualify him to teach IT. No comment was made about Lynch's age or race during the meeting. Indeed, Lynch

could not identify any comment made about his age or race during the entire course of his employment with ITT.

Following this meeting, Darosa talked with the national director, Gary Carlson, and the HR department. Carlson agreed with Darosa that Lynch was not qualified from the time he was first hired. According to Carlson, even though Lynch taught for two years and received great ratings, it was proper to terminate him because he did not meet the qualifications to be an IT instructor. The HR department inquired whether Lynch was qualified to teach any other courses. According to Darosa, at the time, there were no available positions that Lynch was qualified to teach. Although Lynch claims that he was qualified to teach business, he did not request to be transferred, and there is no evidence that such an opening existed. Ultimately, Darosa recommended Lynch's termination, and the HR department issued a termination letter dated November 17, 2008, which provides: "After a review of your academic qualifications we have determined that you do not meet the minimum qualifications to teach in your current subject matter area."

Lynch identifies John Donnenwirth as a similarly situated individual whom ITT retained. Donnenwirth, who also teaches IT, is white and was born in 1960, making him twenty-one years younger than Lynch. Donnenwirth earned a bachelor's degree in Mathematics from Ohio State University and a master's degree in Business Administration from Dominican University. Despite that neither Mathematics nor Business Administration is related to IT, it was never determined that Donnenwirth was unqualified to teach IT. Unlike Lynch, however, Donnenwirth has earned fifteen semester hours in the subject of IT.

Lynch filed a complaint in the district court against ITT and Darosa, raising claims of age and race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.*, and Chapter 4112 of the Ohio Revised Code. ITT and Darosa moved for summary judgment, seeking dismissal of all of Lynch's claims. The district court granted the motion. It ruled that Lynch failed to establish the fourth prima facie element, reasoning that Donnenwirth is not similarly situated because he meets the coursework requirement and has several professional certifications in the area of his teaching. It also found that Lynch failed to demonstrate pretext. According to the district court, Lynch did not satisfy the requirements of the job description, and the only evidence of discriminatory animus that he offered was mere personal belief, conjecture, and speculation. This appeal followed.

II.

We review de novo a district court's grant of summary judgment. *Geiger v. Tower Auto.*, 579 F.3d 614, 620 (6th Cir. 2009). Summary judgment is proper when, viewing the evidence in the light most favorable to the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *CareToLive v. FDA*, 631 F.3d 336, 340 (6th Cir. 2011).

A.

For claims based on circumstantial evidence, a plaintiff alleging that his termination was discriminatory must establish the following four elements: (1) he is a member of a protected class; (2) he is qualified for the position in question; (3) he suffered an adverse employment action; and

(4) he was treated differently than a similarly situated employee outside the protected class. *Arendale v. City of Memphis*, 519 F.3d 587, 603 (6th Cir. 2008); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). The parties agree that Lynch has established the first three elements but dispute whether there exists a genuine issue of material fact on the fourth.

A court's formulation of the similarly situated inquiry should not be exceedingly narrow. *Jackson v. Fedex Corporate Servs*., 518 F.3d 388, 396 (6th Cir. 2008). We consider individuals to be similarly situated if they are similar (though not identical) in all relevant respects. *See Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 353 (6th Cir. 1998). Our task is to make an individualized determination of which factors are relevant based on the factual context of the case. *Id*. at 352.

Given the factual context of this case, we consider it relevant that Lynch is an instructor at ITT and has neither a bachelor's degree in a related area nor fifteen semester hours in the subject of his teaching. Thus, Lynch must identify a younger, Caucasian instructor who has neither a bachelor's degree in a related area nor fifteen semester hours in the subject of his or her teaching but who was retained. For this purpose, Lynch points to Donnenwirth, a younger, white instructor whom ITT retained.[1] Lynch is correct that Donnenwirth's bachelor's degree in Mathematics is not related to IT, just as Lynch's bachelor's degree in Civil Engineering is not related to IT. However, Donnenwirth has earned fifteen semester hours in the subject of IT, whereas Lynch has not. Thus,

---

[1]Although Donnenwirth happens to teach IT, the same subject that Lynch taught, we do not consider this to be a relevant factor for purposes of the similarly situated inquiry.

while Donnenwirth may be similarly situated in some relevant respects, he is not similarly situated in *all* relevant respects.

Lynch argues that this analysis is contrary to *Jackson*, where this court criticized the district court's narrow formulation of the similarly situated standard and blind adherence to the employer's position regarding which skills and qualifications were relevant. *Jackson*, 518 F.3d at 396–97. Unlike the district court in *Jackson*, however, we have independently determined the relevant factors after considering the factual context of this case. Moreover, we do not read *Jackson* to stand for the inflexible position that an employer's articulated reason for the termination can *never* be considered in the similarly situated inquiry. Indeed, we have held that some overlap in the *McDonnell Douglas* analysis is permissible. *See White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 243 (6th Cir. 2005) (reviewing the plaintiff's qualifications when analyzing the second and fourth prongs of the prima facie case under *McDonnell Douglas* did not impermissibly conflate them). In this case, defining similarly situated as having neither a bachelor's degree in a related area nor fifteen semester hours in the subject of his or her teaching is not overly narrow. Accordingly, we conclude that there is no genuine issue as to any material fact that Lynch failed to establish the fourth element of his prima facie case.[2]

---

[2]We decline to consider Lynch's alternative argument, raised for the first time in this appeal, that he established the fourth element through evidence that he was replaced by someone outside the protected class. *See J.C. Wyckoff & Assoc., Inc. v. Standard Fire Ins. Co.*, 936 F.2d 1474, 1489 (6th Cir. 1991).

B.

Even assuming that Lynch established a prima facie case, the burden of production would shift to ITT and Darosa to articulate a legitimate nondiscriminatory reason for his termination. *Leadbetter v. Gilley*, 385 F.3d 683, 690 (6th Cir. 2004). Lynch concedes that ITT and Darosa satisfy this burden. ITT and Darosa assert that Lynch was terminated because he lacks the qualifications required by the job description to teach IT. The burden would then return to Lynch to show that the proffered reason is merely a pretext for what is actually a discriminatory firing. Traditionally, this showing can be made through evidence that: (1) the reason has no basis in fact; (2) the reason does not actually motivate the adverse employment action; or (3) the reason is insufficient to explain the adverse employment action. *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 586 (6th Cir. 2009). There is also support for establishing pretext "by offering evidence that the employer's proffered reason . . . was never used in the past to discharge an employee." *Smith v. Chrysler Corp.*, 155 F.3d 799, 805–06 (6th Cir. 1998).

Lynch first argues that the articulated reason for his termination has no basis in fact because he *does* possess the necessary qualifications. Yet this directly contradicts Lynch's own admission that his bachelor's degree is not related to IT and he has not earned fifteen semester hours of IT. Further, on this record, we are unable to determine independently which courses listed on Lynch's transcript count or should count as credits in the subject of IT. And although Lynch focuses on the fact that he was apparently deemed fully qualified to teach IT at the time of hire, this is not evidence that the proffered reason for his termination has no basis in fact. *Cf. Upshaw*, 576 F.3d at 586

- 10 -

(stating that "an admitted mistake . . . constitutes a legitimate nondiscriminatory reason"). Lynch also points to alleged comments and actions by Contiguglia, which he argues show ageist and racial animosity. But such comments and actions are not evidence that Lynch in fact meets the requirements of the job description, though they could be relevant to another method of proving pretext. Similarly, the opinions of McClendon and Lewellen that Lynch is sufficiently qualified is not evidence that Lynch in fact holds a bachelor's degree in an area related to IT and has earned fifteen semester hours of IT. Thus, Lynch has failed to demonstrate pretext under the first method.

Second, Lynch argues that the proffered reason did not actually motivate his termination. As evidence of this, he claims that the reason for his termination has shifted over the course of this litigation. But the record reflects, and Lynch previously admitted, that the proffered reason has always been that he failed to meet the requirements of the job description. Lynch also claims that comments made by Contiguglia suggest that his termination was actually motivated by age and race. Contiguglia's comments, however, were neither ageist nor racist. Indeed, none of the individuals deposed could recall Contiguglia, or any employee for that matter, ever making a remark relating to Lynch's age or race. Accordingly, Lynch has failed to demonstrate pretext under the second method.

Third, Lynch argues that the proffered reason is insufficient to explain his termination because (1) Donnenwirth is similarly situated but was retained, and (2) ITT failed to transfer Lynch to an open position for which he was qualified. These arguments likewise fail. For the reasons stated above, Donnenwirth is not similarly situated to Lynch. Further, Lynch has offered no

evidence, aside from conjecture, that an open position into which he could be transferred existed. Thus, he has not demonstrated pretext under the third method.

Lynch last argues that the proffered reason was never used in the past to discharge an employee. *See Smith*, 155 F.3d at 805–06. However, ITT offered evidence that it hired Gary Abramowski but later terminated him upon discovery that his degree was not from an accredited university as required by the job description. Therefore, Lynch is not the only person who has been fired for failure to meet the requirements of the job description. And although Abramowski was terminated after Lynch, as the district court properly reasoned, "his termination occurred well before the commencement of this law suit and there is no indication that this case influenced that decision in any way." Accordingly, under any method, there is no genuine issue as to any material fact that Lynch has failed to demonstrate pretext.

### III.

For these reasons, we affirm the district court's grant of summary judgment.

MARTHA CRAIG DAUGHTREY, Circuit Judge, *dissenting*.

Because the record on appeal establishes genuine disputes related to several highly material facts – including what turned out to be the dispositive issues of fact in this case – summary judgment was improperly granted against the plaintiff, Graham Lynch, and in favor of the defendants, ITT Technical Institute, Inc., and Tony Darosa. Even a superficial reading of the evidence reveals that crucial errors were made by the district court, both by making inappropriate findings of fact and misapplying relevant law. Given these mistakes of law and the existence of disputed fact questions that should have gone to a jury, the summary judgment order should not be sustained. From my colleagues' decision to the contrary, I respectfully but emphatically dissent.

In affirming the district court, the majority rests its opinion on the same crabbed, and frequently incorrect, facts recited in the district court's decision – many of them distorted because the district court plainly failed to construe them in the light most favorable to the plaintiff, the fundamental legal standard in deciding a defendant's motion for summary judgment. *See, e.g.*, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). If the facts were as straightforward as those set out in the majority opinion, the result they reach would be as easily substantiated. In my judgment, they simply are not.

Perhaps the most profound error in the majority's analysis is its conclusion that in order to "avoid jeopardizing its accreditation, ITT require[d] all instructors to hold a bachelor's degree in a 'related area' to their teaching subject and to have earned at least fifteen semester hours in 'the subject' of their teaching." Thus it follows, also according to the majority, that because Lynch had

"neither a bachelor's degree in a related area nor fifteen semester hours in [information technology or IT,] the subject of his . . . teaching," he was not qualified to teach at ITT and was properly subject to termination. And, according to the majority, Lynch could not make out a *prima facie* case of discrimination because his designated comparator, John Donnenwirth, *was* qualified to teach at ITT, given that he had completed 15 semester hours in IT and, thus, was not similarly situated to Lynch. Finally, the majority posits that even if Lynch could establish a *prima facie* case, he could not rebut ITT's legitimate business reason for his termination, *i.e.*, his lack of qualifications to teach IT.

As the discussion that follows will show, however, there was at least a dispute of fact about all of these propositions, and, in some instances, no basis in fact at all to support them. For example, ITT's retention of Lynch as an instructor could *not* have jeopardized the school's accreditation, because the faculty standards applied to the instructional positions at ITT by its accrediting body, the Accrediting Council for Independent Colleges and Schools (ACICS), did not require either a "degree in a related field" or "fifteen hours in the area of teaching" to qualify in Lynch's field of instruction. Instead, the ACICS standards provided that instructors teaching courses such as IT "shall hold bachelor's degrees at a minimum and shall be assigned based on their major and minor academic preparation *and/or related experience*." (Emphasis added.) Indeed, even the requirement of a bachelor's degree was subject to an exception for "instructors who have demonstrable current exceptional professional level experience in the assigned field." Moreover, the ACICS had inspected Lynch's credentials on an individual basis in 2007 and registered no objection to his continuation as an IT instructor at ITT's facility in Warrensville Heights, Ohio. And, finally, John

Donnenwirth's qualifications to teach IT were considered "questionable" even before Lynch's credentials came under scrutiny, but Donnenwirth's qualifications were parallel to Lynch's, making him a completely adequate comparator in this case. The only dissimilarities between Lynch and Donnenwirth were age (and, thus, the relative length of their professional experience) and race.

What difference does it make to the outcome here that the district court got many of the material facts wrong and failed to recognize the significance of the disputed facts? The answer is simple: an accurate view of the record, taking the plaintiff's evidence and the inferences derived from that evidence as true, fully supports the existence of a *prima facie* case and, at the same time, demonstrates the pretextual nature of the defendants' articulated rationale for Lynch's termination. What is before us is a case that should have been submitted to a jury, as the record plainly shows.

Indeed, most of the facts set out in the majority opinion support a result contrary to the one reached by the district court. Those facts reflect that Lynch was hired in 2006 as an adjunct (part-time) instructor at ITT's facility in Warrensville Heights and promoted to full-time status within six months. He was 67 at the time, having initially retired after a remarkable career in technology that had spanned some four decades and began in 1962, when Lynch graduated from Ohio University with a bachelor's degree in civil engineering. Following graduation, he was appointed to the United States Air Force as a second lieutenant and assigned to systems engineering, where he first encountered computers and was engaged in "implement[ing computer] application for base civil engineering functions." Fascinated by computers, Lynch decided to make this new field his life's work. As a result, he left the military in 1968 with the rank of captain and was hired as a manager

at IBM during the early years of its computer development and sales. There his duties as a "systems engineer" included "help[ing] clients program and set up their computing systems." Working in the burgeoning IT field, Lynch also picked up wide experience, from data processing to the design of technical networks. Ultimately, he became the head of information technology systems for San Diego County, California, the eighth largest urban area in the country. Along the way, Lynch acquired an MBA from Pepperdine University and taught training courses in information technology in the military and in industry. He also taught academic courses in IT at Chapman University (a four-year institution), at Riverside Community College in California, and at Brown-Mackie, a technical/vocational school in Ohio. During his teaching career, Lynch taught computer programming, systems design, and networking – all before becoming an instructor at ITT. The majority concedes that "Lynch's work experience relating to computing is extensive" but fails to recognize that the combination of a bachelor's degree and his "extensive" IT experience was sufficient to satisfy ACICS's accreditation standards.

At ITT, Lynch's performance reviews were consistently above average, and he was a favorite with the IT students, many of whom were African-American – as was Lynch. At the time of his termination from ITT, he was, in fact, the only full-time African-American instructor on the faculty.

The beginning of the end of his tenure started with a purported "rumor" that he had made "race" comments in class, as reported to Ronald McClendon, the dean of students (the highest academic position on campus), by Ann Contiguglia, who was the school's director (the highest administrative position). McClendon investigated and could find no basis for Contiguglia's report,

but he may not have been surprised by it – according to his testimony, Contiguglia was known to "undervalue" African-America staff members, speaking condescendingly to them and treating them differently from other ITT employees. She made her position on Lynch's continued employment clear to McClendon, insisting that "[h]e's got to go," although the record reflects no basis for her assertion. There is, for example, no evidence that she considered Lynch unqualified to teach because of his academic record. McClendon, on the other hand, considered Lynch an asset to ITT, both because of his academic credentials and his many decades of experience in the "real world."

Eventually, McClendon became frustrated with working under Ann Contiguglia and resigned his position as dean. He was replaced by Ronald Lewellen, who also ran head on into Contiguglia's campaign to have Lynch fired. Almost immediately, Lewellen had the impression that her motivation was "more personal than professional" and became convinced that age as well as race discrimination was part of the dynamic. Lewellen could not rationalize Contiguglia's animosity any other way, because he considered Lynch fully qualified as an IT instructor.

As previously noted, Lynch's credentials had been individually scrutinized by ACICS, which required annual reports from, and made periodic on-site visits to, post-secondary educational institutions seeking to maintain accreditation. As part of the process, ACICS officials routinely examined the academic credentials of each faculty member, but they were unable to review Lynch's file for ITT's February 2007 report because his university transcripts were missing from the records submitted by ITT. As a result, ACICS declined to find ITT in compliance with its accreditation standards. Lynch's transcripts were soon located on file at ITT's headquarters in Carmel, Indiana,

and forwarded to the ACICS office for inspection. No questions about Lynch's academic credentials were raised as a result, indicating that Lynch met the standards set by ACICS for teaching IT. Those credentials were, of course, the same at the time Lynch was terminated by ITT, except that by then he also had two years of successful teaching there.

Nor had any questions arisen about his credentials to teach when he was hired in 2006. He was interviewed by Henry Jones, Chair of the IT Department at ITT, and Rebecca Browning, who was then the academic dean at the Warrensville Heights campus. Jones filled out the evaluation form used in ITT's hiring process, characterizing Lynch as "exceptional" in every one of some 13 categories on the list – including "education and/or training" and "knowledge of work." Jones listed "experience, intelligence, [and] motivation" as the qualities that "make this applicant desirable for the position" and ended the evaluation by noting that Lynch was "very impressive." Indeed, Jones later submitted an affidavit that read: "Mr. Lynch was *fully qualified under the criteria of ITT in the area of Informational Technology*. At no time did I question Mr. Lynch's qualifications, or anyone else to my knowledge questioned Mr. Lynch's qualifications." (Emphasis added.)

There is no dispute that, despite his myriad credentials to teach, Lynch was abruptly terminated from his position at ITT. There is, however, a major dispute about the reason for his termination that impacts both his ability to establish a *prima facie* case of discrimination and his ability to establish pretext on the part of ITT in terminating him. The evidence in the record at the summary judgment stage reflects various explanations for Lynch's departure, depending on whose version is credited. Tony Darosa, the person who actually fired Lynch, testified that he alone made

the decision to terminate. But his testimony concerning the basis for Lynch's termination shifted from one explanation to another, suggesting, if not establishing, pretext. *See Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 592 (6th Cir. 2002) ("Shifting justifications over time calls the credibility of those justifications into question. By showing that the defendants' justification for firing him changed over time, [the plaintiff] shows a genuine issue of fact that the defendants' proffered reason was not only false, but that the falsity was a pretext for discrimination."); *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1167 (6th Cir. 1996) ("An employer's changing rationale for making an adverse employment decision can be evidence of pretext.").

Darosa was an ITT district manager over 11 schools, with an office in Indiana. He visited the Warrensville Heights campus to meet with the department chairs in mid-November 2008 and told them that Lynch would be let go. But he also told them to "keep it a secret" until he came back to Warrensville Heights at the end of the school term, which was two weeks away. Nevertheless, out of respect for Lynch, at least two of the ITT department chairs told Lynch that he was about to be fired, but not why – apparently because they had been given no reason. Lynch said that on the day Darosa returned to campus, December 2, he was escorted to the director's office by Ron Lewellen, still the academic dean at that time, to meet with Darosa. But Lewellen did not intend to stay and wanted no part in Lynch's termination; instead, he left the room – as Lynch put it, "in disgust" – slamming the door as he went out. Darosa then informed Lynch that he was being let go, saying only, "[T]here's nothing we can do. You are not qualified to teach the courses you are teaching, period." As Lynch later commented, "That was it."

- 19 -

Indeed, that actually was it. In the meeting, Darosa did not elaborate on Lynch's purported lack of qualifications, nor did he suggest a way in which any deficiency could be remediated. However, a "memo to file" from ITT's "human resource partner," Kim Hansen, dated almost a month *before* Lynch was officially told of his termination, indicated that the campus was undergoing a reduction in force, a process about which apparently none of the non-administrative staff at Warrensville Heights knew. The memo indicated that Lynch had "been found to not meet the minimum qualifications to teach in the subject area assigned as a full-time instructor" because he "has a Bachelors [*sic*] degree in Electronics," not IT. The memo concluded, "There is not an opportunity for Mr. Lynch to teach full-time in Electronics but he will be offered the opportunity to teach on [a part-time] basis or opt for severance." Of course, the record shows clearly that Lynch's undergraduate degree was *not* in electronics, that he had never taught electronics, and that he was not offered a part-time position of any kind when he was terminated as an IT instructor, although by education he was qualified to teach business administration. Again, the record hints strongly at pretext.

Significantly, the memo-to-file was far from the only conflicting evidence concerning the basis for Lynch's dismissal. Darosa's inability to stick to one explanation or another was particularly confounding. He testified that in reaching the decision to fire Lynch, he had reviewed only Lynch's "source documents," by which he meant "resume and transcripts" and nothing else – including performance evaluations. Those teaching-performance reviews, Darosa maintained, "wouldn't necessarily determine whether someone is qualified to teach a course" because "an

evaluation would simply . . . say [how] this person is doing, is performing at a certain level, but it wouldn't necessarily qualify someone to teach a course." Asked if he took "experience in the field" into consideration, as both the ACICS and the ITT standards permitted, Darosa responded, "Absolutely, as long as it's listed on the resume." But perversely, he later maintained that he had discounted Lynch's years of real-world experience because his most recent work was as in management, referring to Lynch's position as Chief Information Officer of San Diego County and as head of IT contract services for BP North America. These positions, Darosa postulated, "would be too far removed from the lower level help desk person to be an effective [IT] instructor." What was needed, Darosa said, was entry-level experience, "hands-on first level experience that he would be teaching our students." But, of course, Lynch had picked up exactly that kind of experience in the various positions he held as he rose to the top in the IT field. Darosa apparently considered experience as a "lower level help desk person" to better equip an IT instructor than the years of experience at every performance level that Lynch brought to the task.

Lynch also had years of experience in the instruction of beginning students like those in his classes at ITT. Surely his extensive teaching credentials qualified him as an IT instructor, Darosa was asked. No, he insisted in response, the ACICS standards did not permit consideration of a candidate's teaching experience in determining qualifications to teach – even, apparently, when the teaching experience was both extensive and in the same field. Such a standard would be thoroughly ludicrous, if true. But, in this case, it was not true. Several of the academic-curriculum experts who were deposed endorsed teaching experience as particularly relevant to one's qualifications to teach,

and at least one ITT document provided that in hiring instructors "teaching experience is preferred."

As for Donnenwirth, the comparator, he too lacked a bachelor's degree in the field of IT, having majored in mathematics. Donnenwirth maintained that because mathematics is the basis for "computing," he should be considered as having a degree in a "related field." He also claimed to have 15 hours in the field of IT, but the head of the IT department, Ron Lewellen, testified that Donnenwirth did not have the necessary hours and had actually been hired on the basis of his work experience. Lewellen also said that he considered Donnenwirth qualified to teach IT based on his classroom performance and what Lewellen had seen of "his interaction with students." Lewellen considered Lynch qualified to teach IT *on the same basis*.

According to Lewellen, Darosa had at one time questioned Donnenworth's qualifications, and Donnenwirth himself testified that "they were concerned that [he] didn't have the academic qualifications, . . . that [he] didn't meet the ACICS qualifications to teach IT." He was saved, Donnenwith said, by his record of "work experience" and considered his colleague Lynch qualified as an instructor *on the same basis*. The reason that both Lynch and Donnenwirth had to be judged on experience rather than their academic background would certainly be apparent to a jury: when Lynch entered engineering school in 1958, there was no field of study known as "information technology." Perhaps he might have amassed 15 hours in that field two decades later, but by that time he was considered an expert in the burgeoning area and was actually teaching others, rather than taking courses himself. Donnenwirth was in college in the early 1980s, in the early years of "computer science," but that was not his major field of study. One of the curriculum experts who

was deposed was asked about substituting work experience for academic credentials in hiring instructors. He used wind energy as an example: "Yes, th[ere] are new fields, but we do not limit it. You may have a teacher who may not necessarily have a degree in a specific [new] field . . . [but has] extraordinary professional experience [in it]." As wind energy is to college curriculum today, so information technology was in the 1960s and 1970s.

The only difference between Donnenwirth's apparent security in his faculty position and Lynch's late-blooming lack of security was that Contiguglia never raised a question about Donnenwirth's qualifications to teach. On the other hand, she had campaigned to have Lynch removed from the faculty, perhaps as part of a reduction in force as the human resources memo suggested, and she succeeded in bringing about his termination. However, the record is replete with evidence of her animus toward Lynch – animus that was evidently a reflection of her distaste for his race and age. The record also establishes that Lynch was the only instructor that witnesses could remember being fired.

The legal standard for determining discrimination under Title VII and the Age Discrimination in Employment Act is well-known. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). A plaintiff must first establish a *prima facie* case of discrimination, either by direct evidence or indirectly by circumstantial evidence. To accomplish the latter, the plaintiff must show that he or she (1) is a member of a protected class; (2) suffered an adverse employment action; (3) was nevertheless qualified for the position; and (4) was replaced by someone outside the class or was treated differently from similarly-situated employees who were not members of the

protected class. *Id.* Once the plaintiff's *prima facie* case is established, the burden falls on the defendant to articulate a legitimate, non-discriminatory reason for the adverse action, and – at that point – the burden shifts back to the plaintiff to show that the defendant's articulated reason is a pretext for discrimination. *Id.* at 803-04.

There is no question that, under the *McDonnell Douglas* framework, Lynch was a member of two protected classes based on his age and race. There is no question that he suffered an adverse employment action. A full review of the record also establishes, as the district court found, that Lynch was fully qualified for the position at issue or – at a minimum – that his qualification to teach at ITT was a matter of disputed fact. Moreover, whether Lynch was treated differently from a similarly-situated employee who was not a member of the protected classes was obviously disputed and should have gone to the jury. We have held repeatedly that Title VII plaintiffs are "not required to demonstrate an exact correlation between [themselves] and others similarly situated" but, instead, "ha[ve] to show only that [they] and [their] proposed comparators were similar in all relevant respects." *Bobo v. UPS*, 665 F.3d 741, 751 (6th Cir. 2012). In this case, the record is replete with evidence of Lynch and Donnenwirth's "similarity in all relevant respects."

The claim of discrimination in this case cannot be brushed aside by a simple declaration that Lynch was not qualified based on his "admission" while being deposed that he did not have the requisite 15 semester hours of study in IT. The statement he made in this regard has been taken out of context, both by the district court and by the majority here. Based on evidence in the record, the jury could find either that Lynch did have the requisite 15 semester hours or their equivalent *or* that

he was not required to have the 15 semester hours because he was fully qualified on the basis of work experience in the field of IT.

Indeed, when Darosa was forced to concede that, based on experience, Lynch met the ACICS standards for teaching courses other than those in general education, he changed tactics and claimed for the first time that ITT's standards were higher that those necessary to achieve ACICS accreditation and that Lynch did not meet the ITT standards. But this claim conflicted with Darosa's previous testimony that he had terminated Lynch because Lynch did not meet the ACICS requirements, which put ITT at risk of losing its ACICS accreditation.

Moreover, the claim regarding the heightened ITT standards was supported only by an *untitled* job description form that met the ACICS requirements for teaching general education courses but clearly did *not* fit the criteria necessary to teach "courses other than general education," such as IT. The critical difference between the two classifications was whether work experience could be taken into account as a substitute for a related bachelor's degree and 15 hours of course work (no, in the case of general education teachers; yes, in the case of those teaching courses other than general education). Allowance for work experience appears nowhere in the submitted job description form. Obviously, a jury could find that the proffered form did not apply to IT instructors.

Thus, the issue comes down to proving the fourth prong of the *McDonnell Douglas* standard and to resolving the matter of pretext. In my judgment, this case is one in which the same evidence that establishes that fourth prong of Lynch's *prima facie* case also satisfies Lynch's burden of

establishing pretext. It seems obvious that Lynch has satisfied the requirements in *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994), *overruled on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 179-80 (2009), by showing "that the proffered reasons had no basis in fact," given that Lynch did meet the ACICS/ITT standards for IT instructors, and also that the reason given for termination "were insufficient to motivate discharge," given that Donnenwirth was similarly situated and was not terminated. But, at the very least, the record establishes genuine issues of material fact that should prevent a grant of summary judgment and be resolved by a jury.

This circuit has developed an unfortunate practice of resolving the overwhelming majority of civil rights cases that come before us by routinely affirming summary judgment granted to defendants by the district courts, thereby depriving arguably meritorious plaintiffs of their day in court. It is time that we adopted a more respectful approach, one that recognizes that employment actions are inherently fact-based. In doing so, we would honor the admonition of the Supreme Court that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). In this case, the evidence clearly did not point in only one direction but was susceptible to reasonable inferences in Lynch's favor on the issues of age and race discrimination. The district court, however, plainly engaged in credibility determinations, weighed the evidence in favor of the *moving* party, and repeatedly misstated facts apparent from the record. Because the majority has put a stamp of approval on the unfortunate result, I respectfully dissent.